# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

BARBARA MOHON,

      Plaintiff,

vs.                                        No. CIV 18-0915 JB\KRS

AGENTRA LLC; TRACYANN NICOLE
HAMILTON, and JANE DOES 1-10,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant Agentra LLC's Motion to Dismiss, filed October 17, 2018 (Doc. 11)("Motion"). The Court held a hearing on February 27, 2019. <u>See</u> Clerk's Minutes at 1, filed February 27, 2019 (Doc. 37). The primary issues are: (i) whether the Court lacks personal jurisdiction over this matter because Defendant Agentra LLC, which itself did not direct or make the alleged telemarketing calls to Plaintiff Barbara Mohon, did not do business in or direct business to the State of New Mexico; (ii) whether Mohon adequately pleas that Agentra LLC is liable directly or indirectly for violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"), for the alleged telemarketing calls Mohon received on Agentra LLC's behalf; (iii) whether Mohon adequately pleas Agentra LLC's direct or indirect liability for violating the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to -26 ("NMUPA"), with those calls; (iv) whether Mohon adequately pleas a New Mexico common law nuisance claim based on the alleged telemarketing calls; (v) whether Mohon adequately pleas a New Mexico common law trespass-to-chattels claim for the alleged telemarketing calls; and (vi) whether Mohon adequately pleas that Agentra LLC participated with

Defendants Tracyann Nicole Hamilton and Jane Does 1-10 in a civil conspiracy to violate federal and state laws through the alleged telemarketing calls. The Court grants the Motion in part and denies it in part. The Court will permit additional discovery on Agentra LLC's relationship with Hamilton to resolve the agency question that underlies the personal jurisdiction, TCPA violation, NMUPA violation, and trespass-to-chattels issues. The Court will dismiss for failure to state a claim the nuisance claim, because Mohon does not allege injury to her real property interests. The Court deems that Mohon states a civil conspiracy claim, because she alleges wrongful acts and a close relationship between Agentra LLC and Hamilton that makes plausible a civil conspiracy by the Defendants to commit unlawful acts.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint for Violations of the Telephone Consumer Protection Act, the Unfair Practices Act and Torts, County of Santa Fe, First Judicial District Court, State of New Mexico (filed in state court August 1, 2018), filed in federal court September 28, 2018 (Doc. 1-1)("Complaint"). The Court provides these facts for background. It does not adopt them as the truth, and it recognizes that these facts are largely Mohon's version of events.

This action arises from Mohon's allegation that the "Defendants operate and profit from a massive, nationwide robo-calling[1] conspiracy designed to sell a type of discounted medical benefit plan Defendants imply in their robo-calls is comprehensive insurance." Complaint ¶ 15, at 4. At the calls' times, Mohon and her telephone were in New Mexico. See Complaint ¶ 16, at

---

[1] "A robocall is a phone call that uses a computerized autodialer to deliver a pre-recorded message, as if from a robot. Robocalls are often associated with political and telemarketing phone campaigns, but can also be used for public-service or emergency announcements." Robocall, Wikipedia, https://en.wikipedia.org/wiki/Robocall (last visited June 22, 2019).

5. Mohon had registered her cellular telephone number with the National Do Not Call Registry, and did not consent to the calls or have a business relationship with the Defendants. See Complaint ¶ 46, at 11; id. ¶¶ 51-52, at 12.

Agentra LLC and Hamilton directed telemarketing calls into New Mexico. See Complaint ¶ 17, at 5. The Defendants, through various telephone numbers, repeatedly called Mohon's cellular telephone, at the number 505-501-3610, with "a pre-recorded message or artificial voice which sought to interest her in 'health insurance,'" and which left a voicemail when prompted. Complaint ¶¶ 21 at 5. See id. ¶¶ 20-22 at 5-6; id. ¶ 24, at 6. Within the first fifteen seconds that , the caller never identified the call's sponsor. See Complaint ¶ 31, at 8. Because of the changing numbers, Mohon could not block the calls, and neither a call-blocking feature on Mohon's cellular telephone, the calls' built-in opt-out feature, or a request through the customer service line at 866-269-1877 stopped the calls. See Complaint ¶¶ 22-23, at 5-6; id. ¶ 27, at 7. During one call, Mohon reached a live telemarketer -- "Tracy" -- who "hung up the phone" when Mohon asked about the telemarketing operations and to send her an email. Complaint ¶ 25, at 6-7. Mohon could not discern the Defendants' identity or location until she purchased a healthcare plan during a call, after which she began receiving "texts, emails and paperwork" from the Defendants identifying Agentra LLC and Hamilton "as the primary parties responsible" for the robo-calls. Complaint ¶ 29, at 7. During the enrollment, Hamilton -- Agentra LLC's agent -- texted Mohon directly. See Complaint ¶ 43-444, at 10. After the purchase, Mohon stopped receiving the telemarketing calls. See Complaint ¶ 32, at 8.

Agentra LLC markets its products through insurance brokers, like Hamilton, who act for it, enter contracts on its behalf, and have access to its exclusive information, as Agentra LLC's

authorized, apparent, or ratification agent.  See Complaint ¶¶ 39-40, 42-43, at 10-11; id. ¶ 45, at 12.  Mohon argues that Agentra LLC controlled Hamilton's conduct and had authority to prevent the telemarketing, should have known about the calls and acted to prevent the calls, and ratified the actions when it accepted the calls' benefits, i.e., the customers.  See Complaint ¶¶ 39-42, at 10; id. ¶¶ 54-56, at 12.  According to Mohon, Agentra LLC and Hamilton:

> a) authorized the phone calls;
>
> b) directly or indirectly controlled the persons who actually made or initiated the calls;
>
> c) allowed the telemarketers access to information and operating systems within Agentra LLC's control for the purpose of selling goods and services;
>
> d) allowed the telemarketers to enter consumer information into Agentra's sales, dialing or operational systems;
>
> e) approved, wrote or reviewed the telemarketing sales script; OR
>
> f) Hamilton reasonably should have known or consciously avoided knowing that the actual telemarketers were violating the TCPA and Hamilton failed to take effective steps within her power to require compliance with the TCPA.

Complaint ¶ 38, at 9-10.

## PROCEDURAL BACKGROUND

Mohon alleges that: (i) the Defendants and/or their agents violated the TCPA by repeatedly calling her telephone and refusing to identify themselves; (ii) the same actions constitute a nuisance, trespass to chattels, and a civil conspiracy; and (iii) these actions violated NMUPA § 57-12-22.  See Complaint ¶¶ 57-65, at 12-13.  On October 17, 2018, Agentra LLC filed the Motion asking the Court to dismiss the Complaint under rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.  See Motion at 14.  Mohon responded on October 25, 2018.  See Plaintiff's Response to Agentra LLC's Motion to Dismiss, filed October 25, 2018 (Doc. 14)("Response").

1.      **The Motion.**

First, Agentra LLC argues that Mohon has not adequately pled a TCPA violation.  See

Motion ¶ 14, at 4.  Agentra LLC explains: "To sufficiently allege a claim against Defendant

Agentra LLC for a TCPA violation, Plaintiff would have to allege that Agentra LLC (a) made a

call to Plaintiff; (b) without Plaintiff's prior express consent; and (c) using an automatic telephone

dialing system or an artificial or prerecorded voice."  Motion ¶ 10, at 3 (citing

47 U.S.C. § 227(b)(1)(A)).  Agentra LLC contends that Mohon has alleged no identifying

information for the call including associated caller-ID numbers, or the calls' dates.  See Motion

¶ 11, at 3.  Further, Agentra LLC complains that Mohon recounts allegations against all the

Defendants and in only one paragraph attributes an action to Agentra LLC.  See Motion ¶ 11-12,

at 3-4.  According to Agentra LLC, the paragraph directly addressing Agentra LLC reflects that

Agentra LLC's emailed Mohon, but the TCPA does not protect against emails.  See Motion ¶ 12,

at 3-4.  Agentra LLC avers that it never called Mohon and that she has not alleged that it did.  See

Motion ¶ 13, at 4 (citing 47 U.S.C. § 227(b)(1)(A); Declaration of Cindy Dale ¶¶ 4-8, at 1

(executed October 15, 2018), filed October 17, 2018 (Doc. 11)("Dale Decl.")).

Second, Agentra LLC argues that Mohon has not adequately pled her NMUPA claim.  See

Motion ¶ 19, at 4 (citing Complaint ¶ 65, at 13).  Agentra LLC contends that the NMUPA prohibits

calls to landline telephones and not to cellular telephones, like Mohon's.  See Motion ¶ 16, at 4

(citing Complaint ¶ 19, at 5).  Agentra LLC draws this conclusion from § 57-12-22's use of the

phrase "'residential subscriber.'"  Motion ¶ 17, at 5 (quotingciting N.M. Stat. Ann. § 57-12-

22.D(4)).).  Agentra LLC again contends that Mohon has not alleged that it as an entity: "(a) placed

an outbound call to Plaintiff; (b) using automatic dialing and recorded message equipment and;

(c) failed to identify itself within 15 seconds of the call." Motion ¶ 19, at 5 (citing Dale Decl. ¶¶ 4-8, at 1).

Third, Agentra LLC avers that Mohon has not pled plausible private nuisance, trespass-to-chattels, or civil conspiracy claims. <u>See</u> Motion ¶ 20, at 5. According to Agentra LLC, Mohon's private nuisance claim is inadequate, because Mohon "does not allege any interest in land that was impacted by the alleged calls." Motion ¶ 21, at 6 (citing <u>Padilla v. Lawrence</u>, 1984-NMCA-064 ¶ 9, 685 P.2d 964, 967). Likewise, in Agentra LLC's view, because Mohon does not allege "physical contact with any of Plaintiff's property . . . , the claim for trespass fails." Motion ¶ 22 at 6 (citing <u>Restatement (Second) of Torts</u> § 158 comment i, § 217 comment e (1965)). Agentra LLC also contends that Mohon has produced no "factual evidence to support that a conspiracy existed." Motion ¶ 23, at 6 (citing <u>Boyd v. United States (In re Boyd Estate)</u>, 2015-NMCA-018, ¶ 19, 344 P.3d 1013, 1017).

Next, Agentra LLC avers that the Court lacks personal jurisdiction over Agentra LLC. <u>See</u> Motion at 6. Agentra LLC disputes that the Court can impute to Agentra LLC its co-Defendants' purported conduct and consequent New Mexico contacts. <u>See</u> Motion ¶ 25, at 7. According to Agentra LLC, the TCPA incorporates common-law agency principles, which reflect that no agency relationship -- and rather an independent contractor relationship -- exists when the principal lacks control over the agent's conduct. <u>See</u> Motion ¶ 26-27, at 7-8. According to Agentra LLC, Hamilton is an independent contractor, <u>see</u> Motion ¶ 28, at 8 (citing Dale Decl. ¶ 9-10, at 2; Agreement Between Agentra LLC and Tracyann Hamilton at 2, 5, filed October 17, 2018 (Doc. 11)("Contract")), which means that Mohon cannot establish Agentra LLC's vicarious liability, <u>see</u> Motion ¶ 30, at 8-9 (citing <u>Jones v. Royal Admin. Servs.</u>, 866 F.3d 1100, 1105 (9th

Cir. 2017)).  Agentra LLC contends that, even if its Co-Defendants were its agents, Mohon cannot establish its vicarious liability for acts, like the telephone calls, which violate state laws and which Agentra LLC did not authorize.  See Motion ¶ 32, 35, at 9, 10 (citing Contract at 2).  Agentra LLC indicates that Mohon provides no information identifying Does 1-10 and, hence, cannot allege them as Agentra LLC's agents.  See Motion ¶ 31, at 9.  According to Agentra LLC, it also could not have ratified the Co-Defendants' actions, because it had no knowledge that they "potentially reached out to Plaintiff in a manner that violated federal or state regulations or in a manner that was otherwise inconsistent with such regulations."  Motion ¶ 35, at 10 (citing Benefit Fin. Co. v. Alarcon, 1991-NMSC-074, ¶ 16, 816 P.2d 489, 493).

Agentra LLC then avers that, without imputing to it its Co-Defendants' conduct, Mohon cannot establish the three-part test for personal jurisdiction in New Mexico: "(1) the defendant's act must be one of the five enumerated provisions in the New Mexico long-arm statute; (2) the plaintiff's cause of action must arise from defendant's act; and (3) minimum contacts sufficient to satisfy due process must be established by the defendant's act."  Motion ¶ 37, at 10-11 (citing State Farm Mut. Ins. v. Conyers, 1989-NMSC-071, ¶ 6, 784 P.2d 986, 987).  Agentra LLC describes itself as a Texas corporation, without a New Mexico residence, business operation, registration, or "legally significant contacts with New Mexico."  Motion ¶ 39, at 11 (citing Dale Decl. ¶¶ 2-3, at 1).  Agentra LLC explains that Mohon's allegation that Agentra LLC emailed her is the sole allegation that it conducted business in New Mexico, and Agentra LLC deems this connection insufficient for personal jurisdiction.  See Motion ¶ 40, at 11 (citing Fabara v. GoFit, LLC, No. CIV 14-1146 JB/KK, 2015 U.S. Dist. LEXIS 118464, at *39-40 (D.N.M. Aug. 20, 2015)(Browning, J.); Zimmerman v. CIT Grp. Inc., Civil Action No. 08-cv-00246-ZLW-KLM,

2008 WL 5786438, at *6 (D. Colo. 2008)(Mix, M.J.)).  Second, Agentra LLC avers that it committed no tortious acts within New Mexico as it made no outbound calls violating the TCPA, NMUPA, or common law.  See Motion ¶ 42, at 12 (citing Dale Decl. ¶¶ 4-8, at 1).

Agentra LLC also avers that finding personal jurisdiction here will violate due process.  See Motion ¶ 44, at 12.  First, according to Agentra LLC, the Court does not have general jurisdiction, because the email correspondence does not rise to "'continuous and systemic' business contacts with New Mexico such that Agentra LLC is 'essentially at home in New Mexico.'"  Motion ¶ 45, at 12 (quoting Diener v. Trapeze Asset Mgmt., No. CIV 15-0566 JB\LAM, 2015 WL 8332933, at *1 (D.N.M. Nov. 30, 2015)(Browning, J.)).  Moreover, according to Agentra LLC, because it did not violate the TCPA or NMUPA, it does not have minimum contacts establishing specific jurisdiction in New Mexico.  See Motion ¶¶ 46-47, at 13.

### 2.    **The Response**.

Beginning with the TCPA claims, Mohon contends: "Only two (2) allegations are necessary to state the basic **Subsection B** TCPA claim: telemarketer called her phone, and telemarketer did so using a pre-recorded message or an automatic telephone dialing system ("auto-dialer" or "robo-call")."  Response at 2 (emphasis in Response)(citing Breslow v. Wells Fargo Bank, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012)(Scola, Jr., J.); Ott v. Mortg. Inv'rs Corp, 65 F. Supp. 3d 1046, 1059-60 (D. Or. 2014)(Stewart, M.J.)).  Mohon also argues that her "Complaint also amply gives notice of multiple 'do not call' or **Subsection C** violations because the Complaint states her phone number is listed on the National Do Not Call Registry (see 47 C.F.R. § 64.1200(c)(2)) and Agentra's telemarketers refused to identify themselves or honor even Plaintiff's specific do-not-call requests."  Response at 2 (emphasis in Response).  Mohon argues

that, to allege a TCPA violation, she does not need to identify the calls' frequency, dates, or telephone numbers, because Agentra LLC's records will reveal that information in discovery. See Response at 2 (citing Sprogis v. Suntrust Bank, No. 6:13-cv-635, 2013 WL 2456090, at *2 (M.D. Fla. June 6, 2013)(Dalton, J.)).

Mohon wants the Court to defer to the TCPA interpretations that the Federal Communication Commission ("FCC") TCPA promulgates. See Response at 3 (citing Mainstream Mktg. Serv., Inc. v. FTC, 358 F.3d 1228, 1236 (10th Cir. 2004)). According to Mohon, in Dish Network, LLC, FCC 13-54, 6574 (released May 9, 2013), filed in federal court October 25, 2018 (Doc. 14-1)("Dish Network"), the FCC determined that, where a contract requires a contractor to follow the TCPA, the contracting entity can face liability for the contractor's actions, see Response at _(citing Dish Network ¶¶ 5, 8, at 6576-77; id. at 6586-87 n.102), and, in Dialing Services, LLC, FCC 14-59, File No. EB-TCD-12-00001812 (released May 8, 2014), filed in federal court October 25, 2018 (Doc. 14-2)("Dialing Services"), the FCC directs decisionmakers "to 'look for a direct connection between a person or entity and the making of a call'" when deciding whether an entity "made" a call, Response at 3 (quoting Dialing Services ¶ 16, at 5). Moreover, Mohon explains that the TCPA incorporates federal common-law agency principles. See Response at 3 (citing Imhoff Invest., LLC v. Alfoccino, Inc., 792 F.3d 627, 635 (6th Cir. 2015)). According to Mohon, these principles include the doctrines of apparent authority and ratification, see Response at 3 (citing Hossfeld v. GEICO, 88 F. Supp. 3d 504, 510 (D. Md. 2015)(Quarles, J.)), which she argues are doctrines that courts should apply to prevent companies from avoiding TCPA restrictions through outsourcing, see Response at 3-4 (citing McCabe v. Caribbean Cruise Line, Inc., No. 13-cv-6131, 2014 WL 3014874, at *3 (E.D.N.Y. July 3, 2014)(Gleeson, J.); Smith v. State Farm. Mut.

Auto. Ins., 30 F. Supp. 3d 765, 774 (N.D. Ill. 2014)(St. Eve, J.)).  Mohon lists the FCC's examples

of facts that support a finding of vicarious liability:

> "[T]he seller ***allows the outside sales entity access to information and systems*** that
> normally would be within the seller's exclusive control, including: access to
> detailed information regarding the nature and pricing of the seller's products and
> services or to the seller's customer information.  The ***ability by the outside sales
> entity to enter consumer information into the seller's sales or customer systems***,
> ***as well as the authority to use the seller's trade name, trademark and service
> mark*** may also be relevant.  It may also be persuasive that the seller approved,
> wrote or reviewed the outside entity's telemarketing scripts.  Finally, a seller would
> be responsible under the TCPA for the unauthorized conduct of a third-party
> telemarketer that is otherwise authorized to market on the seller's behalf if the ***seller
> knew (or reasonably should have known) that the telemarketer was violating the
> TCPA on the seller's behalf and the seller failed to take effective steps within its
> power to force the telemarketer to cease that conduct***."

Response at 4 (emphasis in Response)(quoting Dish Network ¶ 46, at 6592-93).  Mohon avers that

she adequately pled such facts through the Complaint's paragraphs 38, 43 and 45, and stresses that

paragraph 20 adequately puts the Defendants on notice of her vicarious liability claim stemming

from paragraphs 20's through 33's depictions of unlawful calls.  See Response at 4-5.  According

to Mohon, Agentra LLC admits its control over Hamilton and her authority to act on its behalf.

See Response at 7 (citing Restatement (Third) of Agency § 1.01 (2006)).  For Mohon, the Contract

reflects Agentra LLC giving Hamilton authority, and discovery will likely reveal Agentra LLC's

control over the sales parameters under which Hamilton operates, and Hamilton's connections or

lack of connections to other health insurance companies.  See Response at 8.  Mohon argues that

the Court should not rely on the contract's phrase "independent agent," but should consider all the

facts, and emphasizes that, per the FCC, contractual terms forbidding illegal actions do not control

the vicarious liability analysis.  See Response at 8 (citing Durkey v. Pac. Life Ins., Civil Action

No. 17-317, 2017 U.S. Dist. LEXIS 124294, at *28 (W.D. Pa. Aug. 4, 2017)(Lenihan, J.); Sutton

v. Chevron Oil, 1973-NMSC-111, ¶ 4, 515 P.2d 1283, 1285; Dish Network, ¶ 34, at 6586-87; id. at 6587-88 n.102).  Mohon analogizes this case to

> [Dobkin v. Enterprise Financial Group, Inc., No. 2:14-CV-01989 WHW, 2014 WL 4354070, at *3-4 (D.N.J. Sept. 3, 2014)(Walls, J.)] where a motion to dismiss was denied in a TCPA case holding that "'Plaintiff's allegation that Precise representatives directed consumers to a website which automatically rerouted to EFG's website suggests that EFG exerted control over Precise's telemarketing strategy."

Response at 9

Mohon argues alternatively that Agentra LLC gave Hamilton implied authority when it paid her for her activities, suggesting that it approved of them.  See Response at 9 (citing Restatement (Third) of Agency § 2.01).  Mohon also notes that New Mexico recognizes implied authority.  Response at 9-10 (citing N.M. Stat. Ann. §§ 13-401 to -402; Echols v. N.C. Ribble Co., 1973-NMCA-038, ¶ 19, 511 P.2d 566, 569).  Mohon indicates that, in paragraphs 29 through 45, she alleges facts revealing Agentra LLC's connections to the telemarking calls and shows:

> (1) [Agentra LLC] "allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including access to detailed information regarding the nature and pricing of the seller's products and services", (2) the outside sales entity (Hamilton and the Jane Doe defendants) has an ability to "enter consumer information into the seller's sales systems, as well as the authority to use the seller's trade name, trademark and service mark" and (3) Agentra delegated to others the ability to make a contract between Agentra and Plaintiff and exercised control over that process.

Response at 5 (citing Hossfeld v. GEICO, 88 F. Supp. 3d at 510-11).  Additionally, Mohon avers that Agentra LLC ratified Hamilton's and the Does 1-10's actions by manifesting its assent to the conduct.  See Response at 10-11 (citing Restatement (Third) of Agency § 4.07; Keim v. ADF Midatlantic, LLC, No. 12-cv-80577, 2015 U.S. Dist. LEXIS 159070, at *27 (S.D. Fla. Nov. 10, 2015)(Marra, J.)).

Mohon avers that the Court should not decide the agency issue on a 12(b)(6) motion.  <u>See</u> Response at 12-14.  She contends that she will uncover in discovery whether Agentra LLC "'knew (or reasonably should have known)" of Hamilton's acts and "failed to take effective steps within its power to force [Hamilton] to cease that conduct.'"  Response at 12 (alteration added)quoting <u>Dish Network</u>, ¶ 46, at 6592-93).  <u>See id.</u> at 11-12.  She further argues that several states have recognized that the vicarious liability inquiry is inappropriate for 12(b)(6) dismissal and often inappropriate for summary judgment dismissal.  <u>See</u> Response at 12-13.  She stresses that agency is a fact-intensive question.  <u>See</u> Response at 13-14.

Second, Mohon contends that she adequately pleas NMUPA violations.  <u>See</u> Response at 14.  According to her, New Mexico agency law does not "materially differ[]" from federal common law; hence, if she plausibly pleas TCPA violations, she plausibly pleas NMUPA violations.  Response at 14.  Mohon avers that Agentra LLC incorrectly describes the NMUPA as limited to landline telephones.  <u>See</u> Response at 15.  Mohon explains that her allegation in the Complaint's paragraph 46 adequately pleads an NMUPA violation, by alleging that she listed her cellular telephone on the National Do Not Call Registry, which creates a legal presumption that the registered number is residential.  <u>See</u> Response at 15.  In her view, that the Defendants sought to sell her healthcare evidences their understanding that her cellular telephone was a residential number.  <u>See</u> Response at 15.  Mohon defines "residential subscriber" to depend on the use and not the type of telephone line.  Response at 16 (citing <u>Dish Network</u> ¶ 34, at 6586-87).  Mohon admits that the New Mexico Legislature promulgated N.M. Stat. Ann. § 57-12-22 in 1989, before wireless telephones' widespread availability, and that wireless telephone usage has increased rapidly since the statute's enactment.  <u>See</u> Response at 16.

Regarding the state law claims, Mohon first contends that telemarketing "is 'a nuisance.'" Response at 17 (quoting <u>Mims v. Arrow Fin. Servs., LLC</u>, 565 U.S. 368, 372 (2012); and citing <u>Am. Copper & Brass, Inc. v. Lake City Indus. Prod., Inc.</u>, 757 F.3d 540, 544 (6th Cir. 2014); <u>Dish Network</u> ¶ 36, at 6587). Mohon describes that, in New Mexico, nuisances include more than interferences with real property interests. <u>See</u> Response at 17-18 (citing <u>Denney v. United States</u>, 185 F.2d 108, 110 (10th Cir. 1950); <u>Koeber v. Apex-Albuq Phoenix</u>, 1963-NMSC-051, ¶ 3, 380 P.2d 14, 15). Second, she defines trespass to chattels -- here, the cellular telephone -- as "intentional interference with a chattel in the possession of another, without justification," Response at 18 (citing <u>Tex.-N.M. Pipeline v. Allstate Constr.</u>, 1962-NMSC-026, ¶ 5, 369 P.2d 401, 402), and explains that the tort applies to unwanted telephone calls (citing <u>Mey v. Got Warranty Inc.</u>, 193 F. Supp. 3d 641, 647 (N.D. W.Va. 2016)(Bailey, J.)). Mohon describes that, in the Complaint's paragraphs 16, 19-28, 53, and 61, she adequately states these claims by describing the annoyance the Defendants' calls caused her. <u>See</u> Response at 18-19. Third, she asserts that Agentra LLC participated in two conspiracies:"1) conspiracy to accomplish unlawful telemarketing with enough deliberate anonymity that the conspirators were difficult to identify and locate, and 2) conspiracy to sell products and services by unlawful means (robo-calling cell phones and Do-Not-Call registered numbers)." Response at 19. According to Mohon, civil conspiracy claims provide an independent liability basis where "a civil action in damages would lie against one of the conspirators." Response at 19 (citing <u>Salzman v. New Mexican Kennels, Inc.</u>, No. CIV 14-0877 KBM/KK, 2015 WL 13662748, at *2 (D.N.M. June 8, 2015)(Molzen, M.J.)).

Mohon then addresses Agentra LLC's personal-jurisdiction arguments. <u>See</u> Response at 20. She describes that New Mexico provides for jurisdiction to the extent constitutional and has

removed the requirement for "a technical determination of whether a defendant committed" the act at issue. Response at 20 (citing Dudnikov v. Chalk & Vermilion Fine Arts, 514 F.3d 1063, 1070 (10th Cir. 2008); Zavala v. El Paso Cty. Hosp. Dist., 2007-NMCA-149, ¶ 10, 172 P.3d 173, 178; Tercero v. Roman Catholic Diocese, 2002-NMSC-018, ¶ 6, 48 P.3d 50, 54). According to her, a single telephone call, like a telemarketing call, suffices for a minimum contact. See Response at 20 (citing Customwood v. Downey, 1984-NMSC-115, 691 P.2d 57). Mohon contends that the telemarketing call constitutes a purposeful availment and that, because Agentra LLC has an agency relationship with the callers, the Court has personal jurisdiction. See Response at 20-21 (citing Santa Fe Techs. v. Argus Networks, 2002-NMCA-030, 42 P.3d 1221). For Mohon, "[p]ersonal jurisdiction over Agentra can hardly offend traditional notions of fair play and substantial justice where the TCPA was specifically intended to give this Court personal jurisdiction." Response at 22.

According to Mohon, the Complaint's paragraphs 19 through 21 adequately plea facts to show personal jurisdiction, because she states that the Defendants called her cellular telephone number and that "she was greeted by a pre-recorded message or artificial voices." Response at 22. Mohon responds to Agentra LLC's fact-intensive agency discussion by averring that the rule 12(b)(6) analysis should focus on law. See Response at 23. Mohon offers several policy arguments for jurisdiction: (i) today's transportation and telecommunication systems make litigating in a foreign state less burdensome than previously; (ii) New Mexico has an interest in seeing the NMUPA enforced; (iii) the TCPA seeks to deter telemarketing; and (iv) the TCPA and NMUPA "are specifically intended to give [her] a local remedy in a local court." Response at 24.

Mohon asks that, if the Court deems the Complaint inadequate, it grant her leave to amend. See Response at 25 (citing Triplett v. LeFlore Cty., 712 F.2d 444, 446 (10th Cir. 1983)).

**3.      The Hearing.**

Agentra LLC began the hearing by discussing its 12(b)(2), personal jurisdiction arguments. See Draft Transcript of Hearing at 3:13-15 (taken February 27, 2019)(Richmond)("Tr.").[2] Agentra LLC explained that, in determining personal jurisdiction, the telemarketing calls are the relevant factors and not the subsequent communications after Agentra LLC and Mohon consummated a sale. See Tr. at 15-4:9 (Richmond). Agentra LLC argued that, in the Court's analysis, the Court can consider the Dale Decl., which shows that the Court has no jurisdiction. See Tr. at 4:10-25 (Richmond). Agentra LLC contended that Mohon introduces no evidence supporting a prima facie case of "continuous and systematic contact," Tr. at 5:7 (Richmond), creating general jurisdiction, see Tr. at 5:5-14 (Richmond). Agentra LLC indicated that, following the Court's opinion in Fabara v. GoFit, LLC, Mohon has not established a stream-of-commerce argument for general jurisdiction, see Tr. at 5:14-61 (Richmond), and, according to Agentra LLC, Mohon and Agentra LLC's transaction does not create general jurisdiction, see Tr. at 6:1-6 (Richmond).

Agentra LLC continued, arguing that Mohon has not shown evidence to satisfy specific jurisdiction's second prong -- that wrongful conduct occurred to establish jurisdiction. See Tr. at 6:6-10 (Richmond). Agentra LLC contended that Mohon must show that Agentra LLC purposefully directed the telemarketing calls at New Mexico, and knew of and controlled the activity. See Tr. at 6:21-25 (Richmond). According to Agentra LLC, the Contract reveals that

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Agentra LLC did not control Hamilton, and Mohon introduces no evidence to support her allegations. See Tr. at 7:3-19 (Richmond). Agentra LLC emphasized again that the Court should focus on the calls and the callers, and not Agentra LLC, which is not doing business in New Mexico. See Tr. at 7:19-8:4 (Richmond).

Mohon agreed that the Court does not have general jurisdiction. See Tr. at 8:11-12 (Childress). Mohon, however, averred that she alleges vicarious liability and repeated her citation to Santa Fe Technologies v. Argus Networks. See Tr. at 8:15-23 (Childress). She explained that her communications with Agentra LLC, which Agentra LLC wants the Court to disregard, occurred through the telemarketing calls' purchasing process. See Tr. at 8:21-25 (Childress). According to her, moreover, she has sufficiently alleged Agentra's and Hamilton's principal-agent relationship and the Contract supports the relationship. See Tr. at 9:1-7 (Childress). Mohon expanded on the relationship and described that Agentra LLC gave Hamilton access to its systems and consumer information processes, and controlled the terms for purchasing its products. See Tr. at 9:7-20 (Childress). Mohon contended that, even if Agentra LLC did not convey actual authority to Hamilton, apparent authority exists because Mohon could reasonably have understood Agentra LLC to control the health insurance product and the caller -- Hamilton. See Tr. at 9:20-10:1 (Childress). Mohon additionally argued that Agentra LLC should have known about Hamilton's telemarketing, and stated that discovery would establish what Agentra LLC knew and reveal that Agentra LLC ratified the telemarketing. See Tr. at 10:2-21 (Childress).

The Court responded that, for jurisdictional issues, it must reach decisions by a preponderance of the evidence. See Tr. at 10:22-11:1 (Court). It asked Mohon what to do regarding the agency issue. See Tr. at 11:2-4 (Court). Mohon responded that she had alleged

vicarious liability and that Agentra LLC had stated that Hamilton was its agent.  See Tr. at 11:5-15 (Childress).  The Court reiterated that it had only the Contract and could not determine whether Hamilton acted as more than a contractor.  See Tr. at 11:16-22 (Court).  Mohon reiterated that the agency analysis considers all the case's facts and not alone the parties' characterization of a relationship.  See Tr. at 11:23-12:10 (Childress).  Agentra LLC intervened to address Mohon's statements on discovery, and argued that Agentra LLC filed the Motion five months earlier and that Mohon just now mentions her need for discovery.  See Tr. at 12:20-13:4 (Richmond).  Agentra LLC argued that Mohon relies on allegations alone but that Agentra LLC produced the Court revealing that Hamilton was an independent contractor.  See Tr. at 13:4-18 (Richmond).  The Court asked Agentra LLC to describe the Contract, and Agentra LLC explained that the Contract made Hamilton an independent contractor to whom Agentra LLC gave authority to make sales but, according to Agentra LLC, this case focuses on the robo-calls and Agentra LLC did not have "control or authority or ratification or knowledge or anything related to the robo call."  Tr. at 14:22-23 (Richmond).  See id. at 14:4-24 (Richmond).  The Court indicated its intention to consider further the 12(b)(2) motion.  See Tr. at 14:25-15:11 (Court).

Agentra LLC moved to the TCPA argument and indicated that Mohon addresses direct and vicarious liability arguments but has not alleged that Agentra LLC made calls or had an agency relationship with Hamilton.  See Tr. at 15:12-16:2 (Richmond).  Mohon responded that "it's certainly not hard to state a TCPA claim Your Honor, it's basically I have a cellphone, and an auto dial[er] called it.  And these are the people that did it."  Tr. at 16:5-8 (Childress).  Mohon argued that the Complaint adequately made these allegations and pointed the Court to Abramson v. Agentra LLC, No. CV 18-615, 2018 WL 6617819, at *3-5 (W.D. Pa. Dec. 18,

2018)(Mitchell, M.J.), in which the Honorable Robert C. Mitchell, United States Magistrate Judge for the United States District Court of the Western District of Pennsylvania, recently issued a ruling denying a motion to dismiss resembling the Motion. See Tr. at 16:9-23 (Childress). Mohon indicated that "everything sort of circles back around to this vicarious liability issue," Tr. at 18:9-10 (Childress), and, according to her, besides denying vicarious liability, Agentra LLC has not shown why her allegations are inadequate, see Tr. at 18:8-16 (Childress).

Agentra LLC turned to the NMUPA to argue that Mohon's allegations do not indicate who controlled the calls. See Tr. at 18:22-19:8 (Richmond). Agentra LLC reiterated that the NMUPA applies to residential telephone lines only. See Tr. at 19:10-11 (Richmond). According to Agentra LLC, Mohon cites no caselaw applying the NMUPA to cellular telephones, cites a TCPA case to support her stance, and concedes that the New Mexico Legislature enacted the NMUPA before cellular telephones' popularity. See Tr. at 19:11-20:3 (Richmond). Mohon responded that the NMUPA applies to cellular telephones and that she discusses her arguments in the Response. See Tr. at 20:4-10 (Childress). Mohon explained that she has other claims under the NMUPA because the NMUPA makes unlawful all conduct the Federal Trade Commission ("FTC") deems unlawful. See Tr. at 20:18-21:7 (Childress). Mohon reiterated that discovery would reveal Agentra LLC's business relationships with agents like Hamilton and information reflecting that Agentra LLC should have known about these calls. See Tr. at 21:7-19 (Childress).

Last, Agentra LLC addressed Mohon's state common-law claims and averred that, in New Mexico, private nuisance claims must involve private land, see Tr. at 22:7-11 (Richmond), trespass to chattels claims require "physical contact or entry," Tr. at 22:15 (Richmond), and civil conspiracy claims are limited to torts, see Tr. at 22:20-24 (Richmond). Mohon replied that, in her Response,

she cites caselaw supporting her argument, and additionally directs the Court to <u>Dendy v. Chartrand</u>, No. CIV 18-1118 WPJ, 2019 WL 719762, at *2 (D.N.M. Feb. 20, 2019)(Johnson, J.). <u>See</u> Tr. at 23:3-19 (Childress). The Court indicated it would consider granting Mohon discovery and would issue an opinion on the matter. <u>See</u> Tr. at 24:1-18 (Court). The Court planned to notify the parties if it will not require discovery. <u>See</u> Tr. at 24:18-19 (Court). This Memorandum Opinion and Order is the promised opinion.

## <u>LAW REGARDING RULE 12(b)(2)</u>

Motions to dismiss under rule 12(b)(2) test the plaintiff's theory of personal jurisdiction as well as the facts supporting personal jurisdiction. <u>See</u> <u>Credit Lyonnais Sec. (USA), Inc. v. Alcantara</u>, 183 F.3d 151, 153-54 (2d Cir. 1999). Rule 12(b)(2) "sets forth a defense based on 'lack of personal jurisdiction.'" <u>Fabara v. GoFit, LLC</u>, 308 F.R.D. 380, 398 (D.N.M. 2015)(Browning, J.)(quoting Fed. R. Civ. P. 12(b)(2)). In determining personal jurisdiction, a court must test not only the complaint's jurisdictional theory, but also the facts on which jurisdiction is predicated. <u>See</u> <u>Credit Lyonnais Sec. (USA), Inc. v. Alcantara</u>, 183 F.3d at 154 (holding that the court "must determine whether the defendant in fact subjected itself to the court's jurisdiction"). Where a defendant raises a timely challenge contesting personal jurisdiction, the plaintiff bears the burden of establishing that there is personal jurisdiction over the defendant and that the exercise of personal jurisdiction would not violate due-process requirements. <u>See</u> <u>Overton v. United States</u>, 925 F.2d 1282, 1283 (10th Cir. 1991); <u>Rambo v. Am. S. Ins.</u>, 839 F.2d 1415,

1417 (10th Cir. 1988); Jemez Agency, Inc. v. CIGNA Corp., 866 F. Supp. 1340, 1342 (D.N.M. 1994)(Burciaga, J.).

The plaintiff need only make a prima facie showing of personal jurisdiction to defeat a rule 12(b)(2) motion to dismiss. See OMI Holdings, Inc. v. Royal Ins. of Can., 149 F.3d 1086, 1090 (10th Cir. 1998). "A plaintiff may make this *prima facie* showing by demonstrating, by affidavit or other written materials, facts, that, if true, would support the exercise of personal jurisdiction over defendant." Rainy Day Books, Inc. v. Rainy Day Books & Café, LLC, 186 F. Supp. 2d 1158, 1160 (D. Kan. 2002)(Waxse, M.J.). At this stage of the proceedings, it is not for the court to resolve disputed facts. See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 45 (1st Cir. 2002). Rather, the court "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d at 45 (quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)). See Tomkins v. Exec. Comm. of S. Baptist Convention, No. CIV 13-0840 JB/CG, 2015 WL 1569034, at *4 (D.N.M. March 31, 2015)(Browning, J.)(concluding that, in considering whether plaintiff has made a prima facie showing of personal jurisdiction over defendant, the Court must take the complaint's allegations as true to the extent the defendant's affidavits do not controvert them). When "conflicting affidavits are presented, factual disputes are resolved in plaintiff's favor." Behagen v. Amateur Basketball Ass'n of the U.S.A., 744 F.2d 731, 733 (10th Cir. 1984).

When a party contests personal jurisdiction,[3] the plaintiff has the burden of proving personal jurisdiction.  See Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995).  To assert personal jurisdiction over a nonresident defendant, federal courts must satisfy state law and federal due process.  See Doering v. Copper Mountain, Inc., 259 F.3d 1201, 1209-10 (10th Cir. 2001).  Under due process, the Court's jurisdiction exists if the defendants have "minimum contacts" with the forum state, which may rest on specific or general personal jurisdiction, and the exercise of personal jurisdiction must comport with "traditional notions of fair play and substantial justice."  Dudnikov v. Chalk & Vermilion Fine Arts Inc., 514 F.3d at 1070 (internal quotation marks omitted)(quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  See Bristol-Myers, Squibb Co. v. Superior Court of Ca., S.F. Cty., 137 S. Ct. 1773, 1779-80 (2017)("Bristol-Myers"); Daimler AG v. Bauman, 571 U.S. 117, 126 (2014).

1.    **Burden of Proof.**

As already noted, the plaintiff bears the burden of proving personal jurisdiction.  See Wenz v. Memery Crystal, 55 F.3d at 1505.  When jurisdiction is "decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing" of facts that would support the assertion of jurisdiction.  Wenz v. Memery Crystal, 55 F.3d at 1505.  "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavit."  Behagen v. Amateur Basketball Ass'n of the U.S.A., 744 F.2d at 733.  When, however, a defendant presents credible evidence through affidavits or other materials suggesting the absence of personal jurisdiction, the plaintiff must come forward with sufficient evidence to create a

---

[3]Personal jurisdiction can be waived.  See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982).

genuine dispute of material fact on the issue.  See Doe v. Nat'l Med. Servs., 974 F.2d 143, 145 (10th Cir. 1992).  Only if the plaintiff meets the obligation of contesting the credible evidence that the defendant presents does the court resolve the factual disputes in the plaintiff's favor.  See Wenz v. Memery Crystal, 55 F.3d at 1505; Behagen v. Amateur Basketball Ass'n of the U.S.A., 744 F.2d at 733; Clark v. Meijer, Inc., 376 F. Supp. 2d 1077, 1082 (D.N.M. 2004)(Browning, J.).

**2.  Due Process and Personal Jurisdiction.**

The personal-jurisdiction due process analysis is two-fold.  See Fabara v. GoFit, LLC, 308 F.R.D. at 400.  First, the defendant must have "minimum contacts" with the forum state such that it "should reasonably anticipate being haled into court there."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473-76 (1985).  Second, exercising personal jurisdiction over the defendant must comport with "'traditional notions of fair play and substantial justice.'"  Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1070 (internal quotation marks omitted)(quoting Int'l Shoe Co. v. Washington, 326 U.S. at 316).  A defendant may have "minimum contacts" with the forum state in one of two ways, providing a court with either general or specific personal jurisdiction. Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1532-33 (10th Cir. 1996).

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, *Trujillo* [v. Williams], 465 F.3d [1210,] 1218 n.7 [(10th Cir. 2006)](quoting *Helicopteros* [Nacionales v. Hall], 466 U.S. 408,[ 415 (1984)]), and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a *quid pro quo*: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078.  Thus, "[s]uch contacts may give rise to personal jurisdiction over a non-resident defendant either generally, for any lawsuit, or

specifically, solely for lawsuits arising out of particular forum-related activities." Shrader v. Biddinger, 633 F.3d 1235, 1239 (10th Cir. 2011).

For a court to exercise specific jurisdiction "'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" Bristol-Myers, 137 S. Ct. at 1780 (alterations and emphasis in Bristol-Myers)(quoting Daimler AG v. Bauman, 571 U.S. at 127). See id. at 1781 ("[T]here must be an 'affiliation between the forum and the underlying controversy,' principally, [an] activity or an occurrence that takes place in the forum State." (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)("Goodyear"))); Burger King Corp. v. Rudzewicz, 471 U.S. at 472 (ruling that a court may assert specific jurisdiction "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities" (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984))). The United States Court of Appeals for the Tenth Circuit has characterized this inquiry as a two-part test: "[F]irst . . . the out-of-state defendant must have 'purposefully directed' its activities at residents in the forum state, and second, . . . the plaintiff's injuries must 'arise out of' defendant's forum-related activities." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1071 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. at 472). The Supreme Court of the United States has recently emphasized that, "[f]or specific jurisdiction, a defendant's general connections with the forum are not enough." Bristol-Myers, 137 S. Ct. at 1781. In the tort context, a defendant has "purposefully directed" his or her activities at New Mexico or its residents when he or she has: (i) taken intentional action; (ii) the action was "expressly aimed" at New Mexico; and (iii) the action was taken with the knowledge that "the

brunt of th[e] injury" would be felt in New Mexico. <u>Dudnikov v. Chalk & Vermilion Fine Arts,</u> <u>Inc.</u>, 514 F.3d at 1072 (quoting <u>Calder v. Jones</u>, 465 U.S. 783, 789-90 (1984)).

Although agreements alone are likely to be insufficient to establish minimum contacts, "'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.'" <u>TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd.</u>, 488 F.3d 1282, 1287-88 (10th Cir. 2007)((quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. at 473, 478). The mere foreseeability of harm occurring in a particular forum will not support a finding of minimum contacts. <u>See</u> <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 295 (1980)(holding that, although "an automobile is mobile by its very design and purpose," thus indicating that it is foreseeable that a particular automobile may cause injury in a forum state, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause"). "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. at 297. As the Tenth Circuit has further explained, because "mere foreseeability" is not sufficient to establish minimum contacts, a plaintiff "must establish . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook intentional actions that were expressly aimed at that forum state." <u>Dudnikov v. Chalk & Vermilion</u> <u>Fine Arts, Inc.</u>, 514 F.3d at 1077.

General personal jurisdiction jurisprudence has "followed [a] markedly different trajector[y]" than specific personal jurisdiction. Daimler AG v. Bauman, 571 U.S. at 132. The test for general personal jurisdiction turns on whether the defendant is "at home" within the forum state. Daimler AG v. Bauman, 571 U.S. at 137. For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." Daimler AG v. Bauman, 571 U.S. at 137 (quoting Goodyear, 564 U.S. at 924). For corporations, "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction." Daimler AG v. Bauman, 571 U.S. at 137 (quoting Goodyear, 564 U.S. at 924). In Daimler AG v. Bauman, the Supreme Court rejected an argument that "continuous or systematic" contacts within a forum state were, in and of themselves, sufficient to subject a corporation to general personal jurisdiction. Daimler AG v. Bauman, 571 U.S. at 137-38. In so doing, the Supreme Court reemphasized that a corporation is most often exposed to general personal jurisdiction only if that entity is incorporated in the forum state or if the forum state hosts the entity's principal place of business. See Daimler AG v. Bauman, 571 U.S. at 138-39.

Once minimum contacts have been established, a court turns to traditional notions of fair play and substantial justice.

> If [the defendant] is found to have the requisite minimum contacts with [the forum state], then we proceed to the second step in the due process analysis: ensuring that the exercise of jurisdiction over him does not offend "traditional notions of fair play and substantial justice." See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)(quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). [The defendant] bears the burden at this stage to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1080 (10th Cir. 2008). We consider the following five factors, . . . in deciding whether the exercise of jurisdiction would be fair:

> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states or foreign nations in furthering fundamental social policies.

> Id. (brackets omitted); see also OMI Holdings, Inc., 149 F.3d at 1095 (applying these factors in a case involving a Canadian corporation). "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction." TH Agric. & Nutrition, LLC, 488 F.3d at 1292 (internal quotation marks and brackets omitted).

Marcus Food Co. v. DiPanfilo, 671 F.3d 1159, 1167 (10th Cir. 2011)(alterations in Marcus Food Co. v. DiPanfilo). The Supreme Court has recently emphasized that, among the factors, the primary concern "is 'the burden on the defendant.'" Bristol-Myers, 137 S. Ct. at 1780 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. at 292). "Assessing this burden obviously requires a court to consider the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." Bristol-Myers, 137 S. Ct. at 1780.

> "[E]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment."

Bristol-Myers, 137 S. Ct. at 1780-81 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. at 294).

In Silver v. Brown, 678 F. Supp. 2d 1187 (D.N.M. 2009)(Browning, J.), aff'd in part and rev'd in part, 382 F. App'x 723 (10th Cir. 2010)(unpublished)[4], the Court considered whether it had personal jurisdiction over defendants who allegedly slandered, defamed, and caused the plaintiff -- Michael Silver -- distress, by posting a blog on the internet that portrayed him in a negative light.  See 678 F. Supp. 2d at 1204.  The Court determined that it did not have personal jurisdiction over defendant Jack McMullen, because Silver failed to demonstrate that McMullen "was significantly associated with the blog or controlled it in any way."  678 F. Supp. 2d at 1212.  The Court also concluded that it did not have personal jurisdiction over the blog post's author -- Matthew Brown -- because he was not domiciled in New Mexico, had not traveled to New Mexico, and did not transact business there.  See 678 F. Supp. 2d at 1211. The Court said that Brown's blog posts similarly did not establish personal jurisdiction, because

> the blog is closer to an informative website than a commercial website.  No services are offered, and Brown is not collecting revenue from the website.  Brown does not interact with the people who post information on the blog.  Brown, to the Court's knowledge, did not solicit negative postings on the website.  Further, even though people in New Mexico can view the website, the blog is not a website that is

---

[4]Silver v. Brown is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Silver v. Brown, Nard v. City of Oklahoma City, 153 F. App'x 529 (10th Cir. 2005)(unpublished), Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), and Health Grades, Inc. v. Decatur Memorial Hospital, 190 F. App'x 586 (10th Cir. 2006)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

directed solely at the people of New Mexico. The number of people who can access the website in New Mexico in comparison to those who are able to access the website throughout the world, or even in the United States, according to the statistics that Silver provided at the hearing, is nominal.

678 F. Supp. 2d at 1211-12.

On appeal, the Tenth Circuit affirmed the Court's holding as to McMullen, but reversed its decision as to Brown. See 382 F. App'x at 727-32. In an opinion that the Honorable Monroe G. McKay, now-Senior United States Circuit Judge for the Tenth Circuit, authored, and the Honorable Wade Brorby and the Honorable David M. Ebel, Senior United States Circuit Judges for the Tenth Circuit, joined, the Tenth Circuit applied the three-part test from Calder v. Jones to conclude that the Court had personal jurisdiction over Brown. See 382 F. App'x at 727-32. Judge McKay first explained that posting the blog was "clearly an intentional act" designed to damage the plaintiff's reputation. 382 F. App'x at 729. Second, Judge McKay said that Brown had "expressly aimed his blog at New Mexico," where Silver, his business, and the majority of his customers were located. 382 F. App'x at 729. Judge McKay noted: "It was about a New Mexico resident and a New Mexico company. The blog complained of Mr. Silver's and [his business'] actions in the failed business deal. Those actions occurred mainly in New Mexico." 382 F. App'x at 729-30. Third, Judge McKay explained that Brown knew Silver would suffer the brunt of his injury in New Mexico, as the state was "unquestionably the center of his business activities." 382 F. App'x at 730.

In several other recent cases, the Court addressed whether it could assert general or specific jurisdiction over non-individual entities. In Fabara v. GoFit, LLC, a plaintiff -- injured by an allegedly defective exercise ball in New Mexico -- brought suit against the manufacturer, which was incorporated and headquartered in Oklahoma. See 308 F.R.D. at 408. The manufacturer

moved to dismiss the complaint, under rule 12(b)(2), arguing that the Court lacked general jurisdiction, because its contacts with New Mexico were neither continuous nor systematic. See 308 F.R.D. at 384. The plaintiff responded with photographs of the manufacturers' products in several stores, arguing that the manufacturer delivered the exercise balls into the stream of commerce with the expectation that New Mexico customers would purchase and use them. See 308 F.R.D. at 389. The Court rejected this theory, explaining that the manufacturer's contacts with New Mexico were not "so systematic and continuous as to make it essentially at home here." 308 F.R.D. at 397. The Court noted that the manufacturer had almost no physical connections with New Mexico and that its New Mexico internet sales -- roughly $20,000.00 over nine years -- were insufficiently "substantial" to support general jurisdiction. 308 F.R.D. at 402-03.

In Diener v. Trapeze Asset Management, Inc., the Court considered whether it had specific jurisdiction over a Canadian asset-management firm that maintained a passive website, placed its name in a third party's money-manager listing, mailed marketing materials to New Mexico, had telephone conversations with plaintiffs located in New Mexico, and ultimately entered into a contract with plaintiffs located in New Mexico. See 2015 WL 8332933, at *1. The Court concluded that it did not have specific jurisdiction for four primary reasons. See 2015 WL 8332933, at *1. First, the website was wholly passive and did not allow visitors "the opportunity to invest or interact with the site." 2015 WL 8332933, at *15. Second, the third-party listing was similarly passive. See 2015 WL 8332933, at *15. Third, the Court noted that "'phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts,'" noting that the alleged torts occurred in Canada. 2015 WL 8332933, at *17 quoting Benton v. Cameco Corp., 375 F.3d 1070, 1077 (10th Cir. 2004)). Fourth, the plaintiffs reached out to the defendants to

create the contractual relationship, distinguishing the case from others finding purposeful availment.  <u>See</u> 2015 WL 8332933, at *17 (citing <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. at 473).

Finally, in <u>Resource Associates Grant Writing & Evaluation Services, Inc. v. Southampton Union Free School District</u>, 193 F. Supp. 3d 1200 (D.N.M. 2016)(Browning, J.), the Court considered whether it had personal jurisdiction over a school district that had never conducted any business in New Mexico, had never sent a representative to New Mexico, and had contacted a New Mexico entity only via telephone and email correspondence that the New Mexico company had initiated.  <u>See</u> 193 F. Supp. 3d at 1239.  Highlighting the contractual nature of the particular contacts at issue, and that due process may be satisfied in contractual relations if the defendant "'reache[s] out' to the forum state," the Court concluded it could not exercise properly personal jurisdiction over the school district, because the school district did not "not reach out to New Mexico to enter into an agreement"; rather, the New Mexico entity had initiated the communications and contract.  193 F. Supp. 3d at 1241-43 (citing <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. at 479-85).

## <u>LAW REGARDING RULE 12(b)(6)</u>

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994)(citing <u>Williams v. Meese</u>, 926 F.2d 994, 997 (10th Cir. 1991)).  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual

allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "At the motion-to-dismiss stage, the court does not weigh the evidence, and 'is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of New Mexico, No. CIV 16-0318 JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F.Supp.2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at

678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., No. CIV 17-1010 JB\SMV, 2019 WL 1434971, at *52 (D.N.M. March 29, 2019)(Browning, J.)quoting Ashcroft v. Iqbal, 556 U.S. at 678). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). "A court will not construe a plaintiff's pleadings 'so liberally that it becomes his advocate.'" Rivero v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *48 (quoting Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.)). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by

reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103-04 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the

Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING JUDICIAL REVIEW OF AGENCY LEGAL INTERPRETATIONS

Under the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-06, 1305, 3105, 3344, 4301, 5335, 5372, 7521 ("APA"), APA,

> [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title),

and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (emphasis in original). The APA states that district courts can:

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be --

      (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      (B)     contrary to constitutional right, power, privilege, or immunity;

      (C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

      (D)     without observance of procedure required by law;

      (E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

      (F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

Under Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994), "[r]eviews of agency action in the district courts [under the APA] must be processed *as appeals*. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." 42 F.3d at 1580 (emphasis in original). See WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d 1314, 1323 (D.N.M. 2009)(Browning, J.). "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the

devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant." N. New Mexicans Protecting Land & Water Rights v. United States, No. CIV 15-0559, 2015 WL 8329509, at *9 (D.N.M. Dec. 4, 2015)(Browning, J.).

In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution of the United States, and Courts reviewing those interpretations apply three different deference standards, depending on the kind of law at issue. First, the federal judiciary accords considerable deference to an agency's interpretation of a statute that Congress has tasked it with enforcing. See United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994). This doctrine is known as Chevron deference, named after the supposedly seminal case, Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron").[5] Chevron deference is a two-step process[6] that first asks whether the statutory provision in question is clear and, if it is not, then

---

[5]The case itself is unremarkable, uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all. Its author, the Honorable John Paul Stevens, former Associate Justice of the Supreme Court of the United States, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years. See generally Charles Evans Hughes, Justice Stevens and the Chevron Puzzle, 106 Nw. U. L. Rev. 551 (2012).

[6]There is, additionally, a threshold step -- the so-called "step zero" -- which asks whether Chevron deference applies to the agency decision at all. See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006). Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th

asks whether the agency's interpretation of the unclear statute is reasonable; as the Tenth Circuit

has explained,

> we must be guided by the directives regarding judicial review of administrative agency interpretations of their organic statutes laid down by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 . . . (1984). Those directives require that we first determine whether Congress has directly spoken to the precise question at issue. If the congressional intent is clear, we must give effect to that intent. If the statute is silent or ambiguous on that specific issue, we must determine whether the agency's answer is based on a permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d at

238 (citing Chevron, 467 U.S. at 842-43).

Chevron's second step is all but toothless, because if the agency's decision makes it to step

two, it is upheld almost without exception. See Jason J. Czarnezki, An Empirical Investigation of

Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental

Law, 79 U. Colo. L. Rev. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely

strike down agency action under step two, and the Supreme Court has done so arguably only

twice."); Ronald M. Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent

L. Rev. 1253, 1261 (1997)("[T]he Court has never once struck down an agency's interpretation by

relying squarely on the second *Chevron* step."). Courts essentially never conclude that an agency's

interpretation of an unclear statute is unreasonable.

---

Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by the agency, for example, do not speak with the force of law and are thus not entitled to Chevron deference, see Christensen v. Harris Cty., 529 U.S. 576 (2000). An affirmative answer to all three inquiries results in the agency's decision passing step zero.

Chevron's first step, in contrast, has bite, but there is substantial disagreement about what it means. The Court has noted the varying approaches that different Supreme Court Justices have taken in applying Chevron deference:

> The Court notices a parallel between the doctrine of constitutional avoidance and the Chevron doctrine. Those Justices, such as [Honorable Antonin Scalia, former Associate Justice of the Supreme Court,] who are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible interpretations from the first step. These Justices are also the most likely to find that the statute is unambiguous, thus obviating the need to apply the second step of each doctrine. Those Justices more likely to find ambiguity in statutes are more likely to eschew applying the doctrines in the first place, out of their distaste for their second steps -- showing heavy deference to agencies for Chevron doctrine, and upholding facially overbroad statutes, for constitutional avoidance.

Griffin v. Bryant, 30 F. Supp. 3d 1139, 1192 n.23 (D.N.M. 2014)(Browning, J.). A number of policy considerations animate Chevron deference, among them: (i) statutory interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, grants discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, i.e., that agencies are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately headed by the President of the United States, can be held politically accountable for their interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state -- found in the Code of Federal Regulations and other places -- than a unified but Circuit-fragmented federal judiciary can.

Second, when agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party complied with them -- courts accord agencies what is known as Auer or Seminole Rock deference. See Auer v. Robbins, 519 U.S. 452 (1997)("Auer"); Bowles v.

Seminole Rock & Sand Co., 325 U.S. 410 (1945)("Seminole Rock").  This deference is applied in

the same manner as Chevron deference and is substantively identical.  There would be little reason

to have a separate name for this doctrine, except that its logical underpinnings are much shakier,

and its future is, accordingly, more uncertain.  Justice Scalia, after years of applying the doctrine

followed by years of questioning its soundness, finally denounced Auer deference in 2013 in his

dissent in Decker v. Northwest Environmental Defense Center, 568 U.S. 597 (2013).  The Court

cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice

himself:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations."  This is generally called *Seminole Rock* or *Auer* deference.
>
> . . . .
>
> The canonical formulation of *Auer* deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for *Auer* to do.  In practice, *Auer* deference is *Chevron* deference applied to regulations rather than statutes.  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.
>
> Our cases have not put forward a persuasive justification for *Auer* deference.  The first case to apply it, *Seminole Rock,* offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Our later cases provide two principal explanations, neither of which has much to be said for it.  First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it.  The implied premise of this argument -- that what we are looking for is the agency's *intent* in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means."  Whether governing rules are made by the national legislature

or an administrative agency, we are bound *by what they say*, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "complex and highly technical regulatory program." That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective. Making regulatory programs effective is the purpose of *rulemaking*, in which the agency uses its "special expertise" to formulate the best rule. But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is." Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation *will be given effect* if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors. If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for *Auer* deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that *Congress* enacted, as we do per *Chevron*, it is *a fortiori* reasonable to defer to them regarding the meaning of *regulations that they themselves crafted*. To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all. The theory of *Chevron* (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations. For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands. "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Congress cannot enlarge its *own* power through *Chevron* -- whatever it leaves vague in the statute will be worked out *by someone else*. *Chevron* represents a presumption about who, as between the Executive and

the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.) So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect. "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power." Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it." And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation. *Auer* deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures." *Auer* is not a logical corollary to *Chevron* but a dangerous permission slip for the arrogation of power.

It is true enough that *Auer* deference has the same beneficial pragmatic effect as *Chevron* deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court. The agency's view can be relied upon, unless it is, so to speak, beyond the pale. But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute. For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear. The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing. It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here. And there is another respect in which a lack of *Chevron*-type deference has less severe pragmatic consequences for rules than for statutes. In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute. That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from *Auer* deference, beneficial effect cannot justify a rule that not only has no principled basis

> but contravenes one of the great rules of separation of powers: He who writes a law
> must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 568 U.S. at 616-21 (Scalia, J., dissenting)(alterations and emphasis in original)(citations omitted).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution.  See U.S. W., Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content.  The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

## RELEVANT LAW REGARDING THE TCPA

The TCPA and its enacting regulations restrict and regulate solicitation calls.  See 47 U.S.C. § 227(b).  The statute restricts all calls made to cellular and residential telephone lines:

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States --

> **(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice --
>
> > **(iii)** to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;
>
> **(B)** to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B) . . . .

47 U.S.C. § 227(b)(1)(A)(iii). "Congress . . . authorized the [FCC] to implement rules and regulations enforcing the TCPA." Hossfeld v. Gov't Emps. Ins., 88 F. Supp. 3d at 509(citing 47 U.S.C. § 227(b)(2)). The FCC has promulgated regulations regarding the time in which a caller must identify a sponsor:

> (b) All artificial or prerecorded voice telephone messages shall:
>
> > (1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated . . . .

47 C.F.R. § 64.1200. It has also prohibited calls to individuals on the National Do Not Call Registry:

> (c) No person or entity shall initiate any telephone solicitation to:
>
> . . . .

(2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:

> (i) It can demonstrate that the violation is the result of error and that as part of its routine business practice, it meets the following standards:

> > (A) Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;

> > (B) Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;
> > (C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;

> > (D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process.

47 C.F.R. § 64.1200.

The TCPA authorizes private rights of action for statutory and regulatory violations.[7] To

plead a TCPA § 227(b)(1)(A)(iii) violation, a plaintiff must show that: (i) a defendant made a

---

[7]The TCPA authorizes:

**(3) Private right of action**

telephone call; (ii) to his or her telephone; (iii) using "any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227.  See, e.g., Dendy v. Chartrand, 2019 WL 719762, at *2 (listing three elements: "(1) to make any call; (2) using any ATDS or an artificial or prerecorded voice; and (3) to any telephone number assigned to a paging service, cellular telephone service . . . or any service for which the called party is charged for the call" (citing 47 U.S.C. § 227(b)(1)(A)(iii); Forrest v. Genpact Servs., LLC, 962 F. Supp. 2d 734, 736 (M.D. Pa. 2013)(Nealon, J.); Breslow v. Wells Fargo Bank, N.A., 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012)(Jones, J.)); Cavero v. Franklin Collection Serv. Inc., No. 11-22630-CIV, 2012 WL 279448, at *2 (S.D. Fla. Jan. 31, 2012)(Altonaga, J.)(requiring a showing of a call to a telephone, without consent, using an automatic dialing system or "artificial or prerecorded voice"); Hossfeld v. Gov't Emps. Ins., 88 F. Supp. 3d at 509 ("To state a claim under this section of the TCPA, a plaintiff must allege: (1) that the defendant called the plaintiff's cellular telephone; (2) using an automatic

---

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State --

    **(A)** an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

    **(B)** an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

    **(C)** both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(3).

telephone dialing system; (3) without the plaintiff's prior express consent."). A defendant may raise the plaintiff's express consent to the telephone call as an affirmative defense. Chavez v. Advantage Grp., 959 F. Supp. 2d 1279, 1281 (D. Colo. 2013)(Blackburn, J.)("The burden of proof is on defendant to establish that plaintiff expressly consented to be contacted at her cell phone number." (citing Breslow v. Wells Fargo Bank, N.A., 857 F. Supp. 2d at 1319; Frausto v. IC System, Inc., No. 10 CV 1363, 2011 WL 3704249, at *2 (N.D. Ill. Aug. 22, 2011)(Zagel, J.); In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 23 F.C.C.R. 559, ¶ 10, at 564-65 (Jan. 4, 2008)).

The TCPA leaves ambiguous whether a seller on whose behalf a caller makes a call is liable and the level of involvement required in making or directing calls for liability to adhere, as the statute uses the words "make" and "initiate" without further elaboration. See 47 U.S.C. § 227(b)(1)(A). The FCC has promulgated an interpretation of this issue, and distinguishes between telemarketers calling individuals and sellers whose products the calls promote. See Dish Network ¶ 26-27, at 6583-84. Cf. Dialing Services ¶ 15-16, at 4-5. The FCC explains that direct liability results from "tak[ing] the steps necessary to physically place a telephone call, and generally does not include persons or entities . . . that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." Dish Network ¶ 26, at 6583 (providing this definition for "initiating" a call). See Dialing Services ¶ 116, at 5 (applying the same definition to "making" a call). According to the FCC, a seller can face vicarious liability under the statute pursuant to "federal common law agency principles." Dish Network ¶ 33, at 6586 The FCC applies similar rules to calls made to telephone numbers on the National Do Not Call Registry. See Dish Network ¶ 30-31, at 6585-86. The FCC recognizes

vicarious liability extending to the individuals "on behalf of" whom the telemarketing makes a call, but limits the liability pursuant to general federal common-law agency standards. See Dish Network ¶ 30-31, at 6585-86.

The Court concludes that these interpretations are reasonable and would reach the same conclusions were it to decide the issue itself. Given that the statute refers to making and initiating calls, the act of making a call should generate direct liability. The Court would also apply the general, federal common-law principles of vicarious liability to fill in the statute's ambiguity. The common-law principles of agency are well-established, and, as the statute does not define the circumstances in which vicarious liability applies, importing these established principles to this context -- rather than inventing a new body of law -- is reasonable. Accordingly, the Court follows the Supreme Court's directives in Chevron and defers to the FCC's interpretation. Accord Dobkin v. Enter. Fin. Grp., Inc., 2014 WL 4354070, at *3-4 (applying the FCC's distinction between direct and vicarious liability to § 227) Cf. Hossfeld v. Gov't Emps. Ins., 88 F. Supp. 3d at 510 (applying federal common law vicarious liability rules to § 227(b) violations); Smith v. State Farm Mut. Auto. Ins., 30 F. Supp. 3d at 777 (applying general common law vicarious liability principles to § 227(b) violations). The Court will apply the FCC's interpretation in interpreting liability under the TCPA.

**LAW REGARDING DIVERSITY JURISDICTION AND INTERPRETING STATE LAW**

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), and when applying state law under federal question jurisdiction, a federal district court sitting in diversity jurisdiction applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v.

Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a

district court cannot find a Supreme Court of New Mexico "opinion that [governs] a particular

area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New

Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209,

1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must

always begin with the statute's text, a court formulating an Erie prediction should look first to the

words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M.

2015)(Browning, J.).[8] If the Court finds only an opinion from the Court of Appeals of New

Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in

---

[8]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court that Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state"))).[9]  The Court may also rely on Tenth Circuit decisions interpreting New Mexico

---

[9]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

law.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30

(D.N.M. 2014)(Browning, J.).[10]  Ultimately, "the Court's task is to predict what the state supreme

---

      The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."  (emphasis and title case omitted)).

    [10]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

    The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth

Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state supreme court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or,

the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive and not prescriptive -- interpretive and not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, former United States District Judge for the United States District Court of the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, <u>see</u> <u>Abbott Labs. v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining

a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866. From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the

court would do."  Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley v. Titus, 762

F. Supp. 2d at 1332.

---

determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, then-United States Circuit Judge for the Tenth Circuit, limitation in Wankier v. Crown Equip. Corp. of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court.  "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

## RELEVANT LAW REGARDING THE NMUPA

The NMUPA regulates telephone solicitation within the State of New Mexico.  See N.M. Stat. Ann. § 57-12-22.  It makes unlawful "for a person to make a telephone solicitation for a purchase of goods or services: (1) without disclosing within fifteen seconds of the time the person being called answers the name of the sponsor and the primary purpose of the contact."  N.M. Stat. Ann. § 57-12-22(B)(1).  It also prohibits "mak[ing] a telephone solicitation of a residential subscriber whose telephone number has been on the national do-not-call registry, established by the federal trade commission, for at least three months prior to the date the call is made."  N.M. Stat. Ann. § 57-12-22(C)(1).  For the NMUPA's purposes,

> (3) "residential subscriber" means a person who has subscribed to residential telephone service from a local exchange company or the other persons living or residing with such person; and

> (4) "telephone solicitation" means a voice or telefacsimile communication over a telephone line for the purpose of encouraging the purchase or rental of or investment in property, goods or services and includes a communication described in this subsection through the use of automatic dialing and recorded message equipment or by other means, but "telephone solicitation" does not include a communication:

>> (a) to a residential subscriber with that subscriber's prior express invitation or permission;

>> (b) by or on behalf of a person with whom a residential subscriber has an established business relationship;

>> (c) made for the sole purpose of urging support for or opposition to a political candidate or ballot issue;

>> (d) made for the sole purpose of conducting political polls or soliciting the expression of opinions, ideas or votes; or

>> (e) by a person who is a duly licensed real estate broker pursuant to Section 61-29-11 NMSA 1978, who is a resident of the state and whose telephone call to the consumer is for the sole purpose of selling, exchanging,

purchasing, renting, listing for sale or rent or leasing real estate in accordance with the provisions for which he or she is licensed and not in conjunction with any other offer.

N.M. Stat. Ann. § 57-12-22(D)(3)-(4).

No New Mexico state court case addresses these provisions of the NMUPA and only one New Mexico federal district court discusses them. See Dendy v. Chartrand, 2019 WL 719762, at *3-4. In the opinion, the Honorable William P. Johnson, Chief United States District Judge for the United States District Court for the District of New Mexico, considered whether the plaintiff had stated a claim under the NMUPA's § 57-12-22(A) and (C). See Dendy v. Chartrand, 2019 WL 719762, at *3-4. Relying on § 57-12-14, Chief Judge Johnson applied the TCPA's standards to the NMUPA and concluded that the plaintiff stated a plausible claim, where the defendant called unsolicited the plaintiff's cellular telephone with a prerecorded or artificial message, and the plaintiff was listed on the National Do Not Call Registry. See Dendy v. Chartrand, 2019 WL 719762, at *4 (citing N.M. Stat. Ann. § 57-12-14 ("It is the intent of the legislature that in construing Section 3 of the Unfair Practices Act the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts.")).

The Court concludes that the Supreme Court of New Mexico would agree with Chief Judge Johnson's conclusion. The Supreme Court of New Mexico directs courts analyzing statutes to begin with the statute's plain meaning. See Griego v. Oliver, 2014-NMSC-003, ¶ 21, 316 P.3d 865, 875 ("Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance." (quoting N.M. Att'y Gen. v. N.M. Pub. Regulation Comm'n, 2013-NMSC-042, ¶ 26, 309 P.3d 89, 97)). Section 57-12-14 references the NMUPA's section 3, which provides: "Unfair or deceptive trade practices and unconscionable

trade practices in the conduct of any trade or commerce are unlawful." N.M. Stat. Ann. § 57-12-3. Unfair and deceptive trade practices include "act[s] specifically declared unlawful pursuant to the Unfair Practices Act," such as the telemarketing activities described supra. N.M. Stat. Ann. § 57-12-2. Moreover, in interpreting New Mexico law, the Supreme Court of New Mexico has looked to federal statutes that resemble New Mexico statutes. See Featherstone v. Bureau of Revenue, 1954-NMSC-080, ¶ 6, 273 P.2d 752, 753; Lopez v. Singh, 1949-NMSC-022, ¶ 7, 205 P.2d 492, 493. Further, the Supreme Court of New Mexico has stated that "two statutes covering the same subject matter should be harmonized and construed together when possible, in a way that facilitates their operation and the achievement of their goals." State ex rel. Schwartz v. Sanchez, 1997-NMSC-021, ¶ 7, 936 P.2d 334, 335 (citing Quintana v. Schnedar, 1993-NMSC-033, ¶ 4, 855 P.2d 562, 564-65).

In deciding a case such as Dendy v. Chartrand, the Supreme Court of New Mexico would begin, therefore, with the NMUPA and then look to persuasive federal law. The Court predicts, accordingly, that the Supreme Court of New Mexico would conclude that § 57-12-22(C)(1) protects wireless telephone users -- like the plaintiff in Dendy v. Chartrand. See Dendy v. Chartrand, 2019 WL 719762, at *4. As a first step, the Supreme Court of New Mexico would look to the NMUPA's plain language, and determine that the literal language precludes wireless telephone users from protection under § 57-12-22(C)(1). See N.M. Stat. Ann. § 57-12-22(D)(2). See also Griego v. Oliver, 2014-NMSC-003, ¶ 21, 316 P.3d at 875. The NMUPA's § 57-12-22(C)(1) applies only to "residential subscriber[s]." N.M. Stat. Ann. § 57-12-22(C)(1). The statute defines "residential subscriber" as "a person who has subscribed to residential telephone service from a local exchange company or the other persons living or residing with such person,"

and defines "local exchange company" as "a telecommunications company that provides the transmission of two-way interactive switched voice communications within a local exchange area." N.M. Stat. Ann. § 57-12-22(D)(2)-(3). The plain meaning of "local exchange company" and "local exchange area" reflects that wireless carriers and local exchange companies operating within a local exchange area are different. See N.M. Exch. Carrier Grp. v. N.M. Pub. Regulation Comm'n, 2016-NMSC-015, ¶ 3-10, 369 P.3d 1058, 1059-61 (differentiating landline-based exchange carriers from wireless services). See also Alma Commc'ns Co. v. Missouri Pub. Serv. Comm'n, 490 F.3d 619, 621 (8th Cir. 2007)(differentiating local exchange carrier and cellular telephone providers); Local-exchange Network, Black's Law Dictionary at 1022 (9th ed. 2009)(describing physical lines as part of local exchanges' networks); Local Exchange, Verizon, https://www22.verizon.com/wholesale/glossary/Glossary-of-Telecom-Terms-l.html#end_user (last visited March 25, 2019)(describing the end of physical lines at a local exchange). Hence, wireless telephone users do not subscribe to local exchange companies. Given this fact, the NMUPA's literal language does not protect wireless telephones. Cf. N.M. Stat. Ann. § 57-12-22(C)(1).

The Court predicts, however, that the Supreme Court of New Mexico would then look to the federal statutes with which the NMUPA "should be harmonized," and would conclude that the National Do Not Call Registry includes cellular telephone users. State ex rel. Schwartz v. Sanchez, 1997-NMSC-021, ¶ 7, 936 P.2d at 335. As the NMUPA's § 57-12-22(C)(1) references the National Do Not Call Registry, the Supreme Court of New Mexico would look to the TCPA, which authorizes the FCC to establish the National Do Not Call Registry. See 47 U.S.C. § 227(c)(3) ("[T]he regulations . . . may require the establishment and operation of a single national database

to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase"). The TCPA does not define "residential subscriber," 47 U.S.C. § 227, but the FCC has concluded that wireless telephone users may subscribe to the National Do Not Call Registry, see Rules and Regulation Implementing the Telephone Consumer Protection Act of 1991, Report and Order at 4-7, FCC 03-153 (released July 3, 2003), filed in federal court October 25, 2018 (Doc. 14-3). The FCC presumes that wireless telephone users who subscribe to the National Do Not Call Registry are residential subscribers. See Rules and Regulation Implementing the Telephone Consumer Protection Act of 1991, Report and Order, at 7. See also Response at 15-17. The FCC reasons that a substantial number of people use wireless telephones and that protecting wireless telephone users from unsolicited telephone calls best aligns with the TCPA's purpose. See Rules and Regulation Implementing the Telephone Consumer Protection Act of 1991, Report and Order, at 4-7.

The Court reasons that the Supreme Court of New Mexico would believe that the NMUPA should work in harmony with the TCPA, see State ex rel. Schwartz v. Sanchez, 1997-NMSC-021, ¶ 7, 936 P.2d at 335, and so would not interpret literally the NMUPA. The Court predicts that the Supreme Court of New Mexico would permit wireless telephone users to bring claims under the NMUPA's § 57-12-22(C)(1). The Court expects that the Supreme Court of New Mexico would conclude that the NMUPA should prohibit calls to all telephone numbers on the National Do Not Call Registry regardless whether the telephone number belongs to a wireless telephone. The Court expects that, in reaching this conclusion, the Supreme Court of New Mexico would deem persuasive cellular telephones' predominance today, and the TCPA's and NMUPA's purposes of

reducing unwanted telephone solicitation.  See Rules and Regulation Implementing the Telephone

Consumer Protection Act of 1991, Report and Order, at 4-7.  The Supreme Court of New Mexico

would view extending protection under § 57-12-22(C)(1) as furthering the TCPA's and NMUPA's

aims of limiting unsolicited calls.

Accordingly, the Court predicts that the Supreme Court of New Mexico would conclude

that § 57-12-22(C)(1) applies to cellular telephone users, like the plaintiff in Dendy v. Chartrand.

The Court predicts that, after making this decision, the Supreme Court of New Mexico would

reach the same conclusion that Chief Judge Johnson reached in Dendy v. Chartrand.  The Court

expects that, when deciding whether a plaintiff states a claim under § 57-12-22, the Supreme Court

of New Mexico would rely on the caselaw articulating standards of liability -- federal agency

principles -- for the TCPA.  See Featherstone v. Bureau of Revenue, 1954-NMSC-080, ¶ 6, 273

P.2d at 753; Lopez v. Singh, 1949-NMSC-022, ¶ 7, 205 P.2d at 493.  Applying these standards

would lead the Supreme Court of New Mexico to the same decision that Chief Judge Johnson

articulated.

## LAW REGARDING FEDERAL COMMON LAW ON AGENCY

"Traditional vicarious liability rules ordinarily make principals or employers vicariously

liable for the acts of their agents or employees in the scope of their authority or employment."

Meyer v. Holley, 537 U.S. 280, 123 (2003)(citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742,

756 (1998)).  A principal may convey actual authority -- either as express authority or as implied

authority -- or apparent authority, and may retroactively authorize actions through ratification.

See, e.g., United States v. Lilly, 810 F.3d 1205, 1211 (10th Cir. 2016); Master Commodities, Inc.

v. Texas Cattle Mgmt. Co., 586 F.2d 1352, 1358 (10th Cir. 1978); Wolfe v. Shell Petroleum Corp.,

83 F.2d 438, 442 (10th Cir. 1936).   Actors' designations of their relationships -- such as a contractual term providing for an independent-contractor relationship -- are not determinative of the relationships' legal status.  See, e.g., 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1251 (10th Cir. 2013)("[A]n independent contractor can be an agent.  An agent need not be an employee."); Milligan v. Anderson, 522 F.2d 1202, 1207 (10th Cir. 1975)("[T]he terms 'agent' and 'independent contractor' [are not] necessarily mutually exclusive.").

"Actual authority incorporates the concepts of express and implied authority."  United States v. Lilly, 810 F.3d at 1211 (quoting Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1278 (10th Cir. 2000)).  Actual authority stems from a principal's expressions to an agent.  See 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1251.  The agent has actual authority when he, she, or it "'reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent'" to engage in an action.  1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1251 quoting Restatement (Third) of Agency § 2.01).  The term "express authority refers" to "actual authority that a principal has stated in very specific or detailed language."  Restatement (Third) of Agency § 2.01.  On the other hand, implied authority "grows out of the implied acquiescence of the principal to the act of the agent."  Buxton v. Diversified Res. Corp., 634 F.2d at 1316.  "Implied Authority" means authority

> either (1) to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or (2) to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent.

Restatement (Third) Of Agency § 2.01.

Apparent authority emerges from a principal's manifestations to a third party. See Master Commodities, Inc. v. Texas Cattle Mgmt. Co., 586 F.2d at 1358 ("Liability based upon apparent authority requires reliance by the third party dealing with the agent upon manifestations by the principal."). The Restatement (Third) Of Agency defines such authority as "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) Of Agency § 2.03. See Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 565-67 (1982)(explaining that apparent authority exists where a third person believes an agent is acting within the authority given to him or her); Am. Nat. Bank of Sapulpa v. Bartlett, 40 F.2d 21, 24 (10th Cir. 1930)(describing apparent authority: "A principal may have so conducted himself that an agent has the power to bind him, without having authority, either express or implied, so to do.").

Ratification occurs after an actor performs an act when a principal retroactively authorizes the action. See Restatement (Third) Of Agency § 4.01 (stating that ratification "may create a relationship of agency when none existed between the actor and the ratified at the time of the act"). To ratify an action, a principal must manifest assent to the action or engage in "other conduct indicative of consent by the principal." Restatement (Third) Of Agency § 4.01. For the assent to be effective, a principal must have "knowledge of material facts involved in the original act," Restatement (Third) Of Agency § 4.06; see Wolfe v. Shell Petroleum Corp., 83 F.2d at 442 ("Knowledge requisite to ratification need not embrace every detail of the transaction. It is sufficient if the purported principal is apprised of all the material facts."); Am. Nat. Bank of Sapulpa v. Bartlett, 40 F.2d at 23 ("Full knowledge of the unauthorized act, and of all material

matters related to it, is an essential of a valid ratification."), and "the actor" must "have acted or purported to act on behalf of the ratified," Restatement (Third) Of Agency § 4.01.

**NEW MEXICO LAW REGARDING AGENCY**

As in the federal common law, in New Mexico, "[a]uthority is the power of the agent to affect the legal relations," including liability "of the principal by acts done in accordance with the principal's manifestations of consent to [the agent]." Romero v. Mervyn's, 1989-NMSC-081, ¶ 11, 784 P.2d 992, 996 (quoting Restatement (Second) of Agency § 7 (1958)). New Mexico courts recognize actual authority -- express and implied; apparent authority; and ratification. See, e.g., Romero v. Mervyn's, 1989-NMSC-081, ¶ 12, 784 P.2d at 996 ("Besides being liable for acts within the actual authority of an agent, a principal also is responsible for the acts of the agent when the principal has clothed the agent with the appearance of authority." (citing Chevron Oil Co. v. Sutton, 1973-NMSC-111, ¶ 7, 515 P.2d 1283, 1286); Echols v. N. C. Ribble Co., 1973-NMCA-038, ¶¶ 18-19, 511 P.2d at 569 ("'An agent's scope of authority embraces not only his actual authority but also that apparently delegated.'" quoting Sw. Portland Cement v. Beavers, 1970-NMSC-164, ¶ 11, 478 P.2d 54, 549)). "[T]he manner in which the parties designate a relationship is not controlling, and if an act done by one person on behalf of another is in its essential nature one of agency, the one is the agent of the other, notwithstanding he is not so called." Chevron Oil Co. v. Sutton, 1973-NMSC-111, ¶ 4, 515 P.2d at 1285.

A principal may convey to an agent actual authority. See Comstock v. Mitchell, 1990-NMSC-054, ¶ 14, 793 P.2d 261, 264. Such authority encompasses express authority, which the principal indicates explicitly, and implied authority, which the principal manifests through words or actions, or which is assumed from the circumstances. See Comstock v. Mitchell, 1990-NMSC-

054, ¶ 14, 793 P.2d at 264 ("Actual authority is given to the agent by the principal in terms that are express, or in terms that are implied from words or conduct of the principal to the agent or from the circumstances of the relationship." (quoting <u>Restatement (Second) of Agency</u> § 7 comment c).

Apparent authority flows from the principal's manifestations to a third party. <u>See</u> <u>Comstock v. Mitchell</u>, 1990-NMSC-054, ¶ 16, 793 P.2d at 264 (citing <u>Restatement (Second) of Agency</u> § 8 comment e, § 27 comment a); <u>Vickers v. N. Am. Land Devs., Inc.</u>, 1980-NMSC-021, ¶¶ 5, 607 P.2d 603, 605 (citing <u>Douglass v. Mut. Ben. Health & Accident Ass'n</u>, 1937-NMSC-097, 76 P.2d 453). Apparent authority exists where "the agent is placed in a position which would lead a reasonably prudent person to believe that the agent did indeed possess that apparent authority." <u>Vickers v. N. Am. Land Devs., Inc.</u>, 1980-NMSC-021, ¶¶ 5, 607 P.2d at 605 (citing <u>Douglass v. Mut. Ben. Health & Accident Ass'n</u>, 1937-NMSC-097, 76 P.2d at 453).

> "If the principal puts one into, or knowingly permits him to occupy, a position in which, according to the ordinary experience and habits of mankind, it is usual for the occupant to have authority of a particular kind, anyone having occasion to deal with one in that position is justified in inferring that the person in question possesses such authority, unless the contrary is then made known."

<u>Vickers v. N. Am. Land Devs., Inc.</u>, 1980-NMSC-021, ¶ 5, 607 P.2d at 605 (quoting <u>Douglass v. Mutual Ben. Health & Accident Ass'n</u>, 1937-NMSC-097, ¶ 6, 76 P.2d 453, 456).

Through ratification, a principal retroactively approves an action undertaken on the principal's behalf. <u>See</u> <u>Otero v. Wheeler</u>, 1985-NMSC-058, ¶ 15, 701 P.2d 369, 373 ("'Ratification means to give validity to the act of another, and in legal phraseology usually means to approve or affirm by a principal what has been done by an agent.'" quoting <u>Guadalupe Cty. Bd. of Ed. v. O'Bannon</u>, 1921-NMSC-008, ¶ 7, 195 P. 801, 803). To ratify an action, a principal must

have knowledge of all material facts.  See Burguete v. G. W. Bond & Bro. Mercantile Co., 1938-NMSC-075, ¶¶ 27-28, P.2d 749, 754-55.  Cf. See-Tee Min. Corp. v. Nat'l Sales, Inc., 1966-NMSC-173, ¶ 5, 417 P.2d 810, 811 ("The fact of knowledge, like any other fact, may be found from either direct evidence or from the existence of other facts and circumstances from which the fact of actual knowledge properly may be inferred").  Ratification occurs where a reasonable person would believe that a principal manifested assent; for instance, acceptance of consideration for a sale may constitute ratification.  Cf. Jessen v. Nat'l Excess Ins., 1989-NMSC-040, ¶ 21, 776 P.2d 1244, 1249 ("Ratification may be implied by acquiescence in the results of an unauthorized act or by retention of the benefits of this act." (citing Morris Oil Co. v. Rainbow Oilfield Trucking, Inc., 1987-NMCA-104, ¶ 19, 741 P.2d 840, 844-45)); Grandi v. LeSage, 1965-NMSC-017, ¶ 26, 399 P.2d 285, 293 ("The defendant, having received the benefits of the sale by his acceptance and retention of the consideration, cannot now reject the burdens incident thereto."); Warren v. New York Life Ins., 1936-NMSC-031, ¶¶ 34-35, 58 P.2d 1175, 1181 (discussing that silence manifests assent when a reasonable person would conclude that it does).

### NEW MEXICO LAW REGARDING NUISANCE

New Mexico recognizes private and public nuisances.  "A private nuisance is a civil wrong based on a disturbance of rights in land."  Jellison v. Gleason, 1967-NMSC-033, ¶ 6, 423 P.2d 876, 877 (finding no nuisance where "there was no wrongful invasion of property rights").  See, e.g., Cooper v. Chevron U.S.A., Inc., 2002-NMSC-020, ¶ 33, 49 P.3d 61, 72 ("A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." (quoting Restatement (Second) of Torts § 821D (1979)); State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque, 1994-NMSC-126, ¶¶ 51-53, 889 P.2d 185, 198-99

(describing a private nuisance as an invasion of interests in land).  To establish a private nuisance, a plaintiff must show "'an intentional invasion [that] is unreasonable,'" i.e., that "'the gravity of the harm outweighs the utility of the actor's conduct.'"  Cooper v. Chevron U.S.A., Inc., 2002-NMSC-020, ¶ 33, 49 P.3d at 72 (quoting Padilla v. Lawrence, 1984-NMCA-064, ¶ 11, 685 P.2d 964, 968).  "[T]he nuisance must 'cause [ ] significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose.'"  Cooper v. Chevron U.S.A., Inc., 2002-NMSC-020, ¶ 33, 49 P.3d at 72-73 (alteration in Cooper v. Chevron U.S.A., Inc.)(quoting Restatement (Second) of Torts § 821F).  In analyzing the harm's gravity, courts consider "'the suitability of the particular use or enjoyment invaded to the character of the locality.'"  Cooper v. Chevron U.S.A., Inc., 2002-NMSC-020, ¶ 33, 49 P.3d at 72-73 quoting Restatement (Second) of Torts § 827(d)).  "[T]he utility of the conduct also takes into account 'the suitability of the conduct to the character of the locality.'"  Cooper v. Chevron U.S.A., Inc., 2002-NMSC-020, ¶ 33, 49 P.3d at 72-73 (quoting Restatement (Second) of Torts § 828(b); and citing Restatement (Second) of Torts § 831).

"A public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either: A. injurious to public health, safety, morals or welfare; or B. interferes with the exercise and enjoyment of public rights, including the right to use public property."  N.M. Stat. Ann. § 30-8-1.  A public nuisance must affect "'a considerable number of people or an entire community or neighborhood.'"  State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque, 1994-NMSC-126, ¶¶ 51-53, 889 P.2d at 198-99 quoting Padilla v. Lawrence, 1984-NMCA-064, ¶ 24, 685 P.2d at 970).  New Mexico divides public nuisances into nuisances per se and nuisances in fact.  See Albuquerque v.

City of Albuquerque, 1994-NMSC-126, ¶¶ 51-53, 889 P.2d 185, 198-99. "A nuisance per se -- also known as nuisance at law -- is 'an activity, or an act, structure, instrument, or occupation which is a nuisance at all times and under any circumstances, regardless of location or surroundings.'" Albuquerque v. City of Albuquerque, 1994-NMSC-126, ¶¶ 53, 889 P.2d at 1999 (quoting 58 Am. Jur. 2d subject § 18 (2019)). "A nuisance in fact -- also called nuisance per accidens -- is usually defined as an activity or structure which is not a nuisance by nature, but which becomes so because of such factors as surroundings, locality, and the manner in which it is conducted or managed." State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque, 1994-NMSC-126, ¶¶ 53, 889 P.2d at 1989.

## NEW MEXICO LAW REGARDING TRESPASS TO CHATTELS

Trespass to chattel "is the intentional use or interference with a chattel which is in the possession of another, without justification." Tex.-N.M. Pipeline Co. v. Allstate Constr., Inc., 1962-NMSC-026, ¶¶ 3-7, 369 P.2d at 402-03. The tort requires an intention to act "for the purpose of interfering with the chattel or with knowledge that a disturbance thereof is substantially certain to occur." Tex.-N.M. Pipeline Co. v. Allstate Const., Inc., 1962-NMSC-026, ¶¶ 3-7, 369 P.2d at 402-03. No New Mexico court has addressed whether the tort pertains to interference with or unwarranted calls on cellular telephones. Other courts have recognized that unauthorized and unwanted electronic communications may establish common-law trespass-to-chattels claims. See, e.g., Mey v. Got Warranty, Inc., 193 F. Supp. 3d at 647; Etzel v. Hooters of Am., LLC, 223 F. Supp. 3d 1306, 1314 (N.D. Ga. 2016)(May, J.); Czech v. Wall St. on Demand, Inc., 674 F. Supp. 2d 1102, 1122 (D. Minn. 2009)(Frank, J.); Am. Online, Inc. v. IMS, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998)(Brinkema, J.); "J. Doe No. 1" v. CBS Broad. Inc., 806 N.Y.S.2d 38, 39 (N.Y.

2005); Intel Corp. v. Hamidi, 71 P.3d 296, 300 (Cal. 2003); Amos Fin., LLC v. H & B & T Corp., 20 N.Y.S.3d 291 (N.Y. Sup. Ct. 2015). The Court located no courts that did not recognize such claims. Some courts require that, to state such a claim, a plaintiff allege an injury more than the receipt of unwanted communications, such as an invasion of memory space or lost time. See, e.g., Am. Online, Inc. v. IMS, 24 F. Supp. 2d at 550 (recognizing trespass-to-chattels claim where the plaintiff alleged that spam emails "cost them time and money and burdened their equipment"); "J. Doe No. 1" v. CBS Broad. Inc., 806 N.Y.S.2d at 39 (deeming that plaintiffs who did not allege any harm to their telephones could not state a trespass-to-chattels claim); Amos Fin., LLC v. H & B & T Corp., 20 N.Y.S.3d 291 (upholding a trespass-to-chattels claim where the injured party alleged that the calls occupied his answering machine's memory space and interfered with his use of his telephone). Other courts have indicated that alleging the mere receipt of unwanted electronic communications suffices. See, e.g., Mey v. Got Warranty, Inc., 193 F. Supp. 3d at 647 ("Even if the consumer does not answer the call or hear the ring tone, the mere invasion of the consumer's electronic device can be considered a trespass to chattels."); Etzel v. Hooters of Am., LLC, 223 F. Supp. 3d at 1314 (inferring that "the unwanted text would have intruded upon the capacity of the class members' cell phones who received the text, regardless of whether the members actually read it."); Czech v. Wall St. on Demand, Inc., 674 F. Supp. 2d at 1122 (permitting a suit to proceed on allegations of receiving unwanted text messages). The Court predicts that the Supreme Court of New Mexico would adopt the approach permitting more liberal recovery and recognize a trespass-to-chattels claim on allegations that a plaintiff received unwanted electronic communications. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d at 1224-25.

# NEW MEXICO LAW REGARDING CIVIL CONSPIRACY

"A civil conspiracy requires a 'combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'" <u>Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC</u>, 2006-NMCA-081, ¶ 21, 139 P.3d 201, 207[11] (quoting <u>Seeds</u>

---

[11]The Court is confident that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statement in <u>Los Alamos National Bank v. Martinez Surveying Services, LLC</u> that "civil conspiracy requires a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." 2006-NMCA-081, ¶ 21, 139 P.3d at 207. The Court bases its prediction on the Supreme Court of New Mexico's decision in <u>Armijo v. National Surety Corp.</u>, 1954-NMSC-024, 268 P.2d 339, in which the Supreme Court of New Mexico states the definition of conspiracy in criminal or civil cases as "a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means." 1954-NMSC-024, ¶ 30, 268 P.2d at 346.

Moreover, the statement follows ideas in the Restatement (Second) of Torts. "[T]he <u>Restatement of Torts</u> reigns" in New Mexico. <u>Peña v. Greffet</u>, 922 F. Supp. 2d 1187, 1228 (D.N.M. 2013)(Browning, J.)(quoting <u>Sisneros v. Fisher</u>, 685 F. Supp. 2d 1188, 1220-21 (D.N.M. 2010)(Browning, J.)).

> [T]he Supreme Court of New Mexico is "very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas." <u>Schmitz v. Smentowski</u>, 1990-NMSC-002, ¶ 49, 785 P.2d [726,] 736. Indeed, the Supreme Court of New Mexico has adopted large swaths of tort law from the Restatement (Second) of Torts. It has "adopted the cause of action of intentional interference with prospective contractual relations, relying on the tort as articulated in Restatement (Second) of Torts § 766(B)(1977)." <u>Schmitz v. Smentowski</u>, 1990-NMSC-002, ¶ 50, 785 P.2d at 736. It has "also recognized the tort of intentional infliction of emotional distress, relying on Restatement (Second) of Torts § 46." <u>Schmitz v. Smentowski</u>, 1990-NMSC-002, ¶ 51, 785 P.2d at 736.

<u>Ormrod v. Hubbard Broad., Inc.</u>, No. CIV 17-0706 JB/KK, 2018 WL 1444857, at *14 (D.N.M. March 22, 2018)(Browning, J.). The Restatement (Second) of Torts provides under the heading "Persons Acting in Concert":

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

v. Lucero, 2005-NMCA-067, ¶ 12, 113 P.3d 859, 863-64).   In Seeds v. Lucero, the Court of

Appeals of New Mexico listed civil conspiracy's elements: "Civil conspiracy consists of showing

'(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were

carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as

a result of such acts.'" Seeds v. Lucero, 2005-NMCA-067, ¶ 18, 113 P.3d at 863-64 (quoting Silva

v. Town of Springer, 1996-NMCA-022, ¶ 25, 121 N.M. 428, 912 P.2d 304).[12]   A civil conspiracy

claim is not actionable "unless a civil action in damages would lie against one of the conspirators,

if the act was done by him alone . . . ." Armijo v. Nat'l Sur. Corp., 1954-NMSC-024, ¶ 30, 268

P.2d 339, 347.

## ANALYSIS

The Court will grant the Motion in part and deny the Motion in part.  The Court will permit

additional discovery on the fact-intensive agency issue, which underlies the personal-jurisdiction,

---

> (a) does a tortious act in concert with the other or pursuant to a common
> design with him, or

Persons Acting in Concert, Restatement (Second) of Torts § 876.  This section, like New Mexico's
articulation of civil conspiracy claims, provides liability when individuals combine to commit an
unlawful act.

[12]The Court predicts that the Supreme Court of New Mexico would agree with this
articulation of a civil conspiracy claim's elements.  The first two elements reflect the definition of
civil conspiracy discussed in the text's preceding sentence, with which the Court predicts that the
Supreme Court of New Mexico would agree, and the final element reflects the general causation
and injury principles underlying contributing tortfeasors' -- including co-conspirators' -- liability:
"Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible
harm to the injured party is subject to liability to the injured party for the entire harm." Restatement
(Second) of Torts § 875.  Cf. Restatement (Second) of Torts § 876.  As discussed supra note 11,
the Supreme Court of New Mexico follows the Restatement (Second) of Torts from which the
Court draws the causation and injury principles associated with contributing tortfeasors.

TCPA-violation, NMUPA-violation, and trespass-to-chattels issues. The Court deems that Mohon states a civil conspiracy claim, because she alleges wrongful acts and a close relationship between Agentra LLC and Hamilton that makes plausible a combination by the Defendants to commit unlawful acts. The Court will dismiss for failure to state a claim the nuisance claim, because Mohon does not allege injury to real property interests.

## I.  THE COURT WILL PERMIT JURISDICTIONAL DISCOVERY TO ALLOW MOHON TO RESPOND TO THE MOTION.

The Court will permit discovery before it decides the personal-jurisdiction issue. The Tenth Circuit has indicated that a court should allow at least limited discovery if such discovery is necessary to respond to a motion to dismiss for lack of jurisdiction. See Sizova v. Nat. Inst. of Standards & Tech., 282 F.3d 1320, 1326 (10th Cir. 2002)("When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion." (quoting Budde v. Ling-Temco Vought, Inc., 511 F.2d 1033, 1035 (10th Cir. 1975)). "While the district court has broad discretion in determining whether to permit jurisdictional discovery, a refusal to grant discovery constitutes an abuse of discretion if either the pertinent jurisdictional facts are controverted or a more satisfactory showing of the facts is necessary." Health Grades, Inc. v. Decatur Mem'l Hosp., 190 F. App'x 586, 589 (10th Cir. 2006)(unpublished)(citing Sizova v. Nat. Inst. of Standards & Tech., 282 F.3d at 1326).

Determining that personal jurisdiction exists is a fact-intensive question turning on whether the Court deems an agency relationship to have existed. See, e.g., Abramson v. Agentra LLC, 2018 WL 6617819, at *5 (finding personal jurisdiction based on Agentra LLC's contractor contacting an individual at his home); Spiegel v. Reynolds, No. 15 C 8504, 2016 WL 6877625, at *5-6 (N.D. Ill. Nov. 22, 2016)(Chang, J.)(permitting jurisdictional discovery where an agent

entered an agreement to engage in telemarketing, pursued the telemarketing campaign, and benefitted from the telemarketing scheme); Kleim v. ADF MidAtlantic, LLC, 199 F. Supp. 3d 1362, 1367-69 (S.D. Fla. 2016)(Marra, J.)(deeming that personal jurisdiction existed based on allegations that the defendant hired individuals to promote a brand and that those individuals sent out the complained-of texts); Neuer v. Dental Res. Sys., Inc., No. 14-2319, 2015 WL 4634044, at *2-6 (D. Kan. July 27, 2015)(Marguia, J.)(upholding personal jurisdiction where unrequested and unwanted facsimile transmissions specifically identified the defendants). The FCC's list of factors for finding apparent authority is, for instance, useful although not determinative in considering whether a plaintiff reasonably believed the telemarketer to act for the seller:

> the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a thirdparty telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

Dish Network ¶ 46, at 6592-93. In determining whether apparent authority establishes an agency relationship, courts reason that an agency relationship exists where a third-party would perceive the alleged principal's actions as manifesting an agency relationship. See Naiman v. TranzVia LLC, No. 17-CV-4813-PJH, 2017 WL 5992123, at *9-12 (N.D. Cal. Dec. 4, 2017)(Hamilton, J.)(concluding that a plaintiff did not establish a defendant's agency relationship with a telemarketer where the plaintiff alleged no facts suggesting that the defendant knew of the

telemarketer's conduct to ratify it, alleged no specific facts showing the defendant's control over the telemarketer, or that the seller made representations to the plaintiff of the telemarketer's authority); Spiegel v. Reynolds, 2016 WL 6877625, at *4 (noting that no apparent authority could exist where the defendant made no representations to the plaintiff); Cunningham v. Health Plan Intermediaries Holdings, LLC, No. 17-CV-1216, 2018 WL 835222, at *6 (N.D. Ill. Feb. 13, 2018)(treating a telemarketer's representations that they sold the defendant's products as insufficient for apparent authority); Smith v. State Farm Mut. Auto. Ins., 30 F. Supp. 3d at 777-79 (concluding that a statement by the telemarketer that the defendant sought the plaintiff's business could not reasonably lead the plaintiff to believe an agency relationship existed with the defendant).

In cases like this one wherein the personal jurisdiction over TCPA claims turns on an agency relationship, where the plaintiff alleges no facts connecting the caller to the defendant, courts recognize no personal jurisdiction. See, e.g., Childress v. Deering, No. CIV 18-0455 LF-KBM, 2019 WL 409825, at *4-5 (D.N.M. Jan. 29, 2019)(Fashing, M.J.)(concluding that the court had no personal jurisdiction where the defendant did not call the plaintiff, the plaintiff surmised -- because the caller had an address identical to the defendants' address -- that the caller and defendant were connected, and the defendant stated that he neither made outbound calls to the plaintiff nor employed anyone to make such calls); Arnold v. Grand Celebration Cruises, LLC, No. CIV 17-0685 JP/KK, 2017 WL 3534996, at *3-6 (D.N.M. Aug. 16, 2017)(Parker, J.)(concluding that no personal jurisdiction existed where, in the face of the defendant's specific denials of telemarketing, the plaintiff alleged no connections between the calls and the defendant company and relied solely on a telemarketer's representation of her association

with an entity sharing the name of a cruise ship that the defendant operated); Cunningham v. Local Lighthouse Corp., No. 3:16-CV-02284, 2017 WL 4053759, at *3-4 (M.D. Tenn. Aug. 7, 2017)(Newbern, M.J.)(granting a motion to dismiss for lack of personal jurisdiction where the plaintiff conclusorily alleged corporate officers' involvement in authorizing a telemarketing scheme), report and recommendation adopted, No. 3:16-CV-02284, 2017 WL 4022996 (M.D. Tenn. Sept. 13, 2017)(Trauger, J.).

Here, a factual dispute exists about the Court's personal jurisdiction. The telemarketing calls suffice for purposeful availment. The caller specifically contacted a New Mexico telephone number -- 505-501-3610 -- to sell the health insurance product. Agentra LLC, however, argues that it is a Texas corporation that did not make calls into New Mexico, and that it engaged Hamilton as an independent contractor, and prohibited her from engaging in activity violating federal or state law. See Motion ¶ 28, at 8 (citing Dale Decl. ¶ 9-10, at 2; Contract at 2); id. ¶ 32, at 9, 10 (citing Contract at 2); id. ¶ 39, at 11 (citing Dale Decl. ¶¶ 2-3, at 1); id. ¶ 42, at 12 (citing Dale Decl. ¶¶ 4-8, at 1). Mohon concedes that the Court lacks general jurisdiction over Agentra LLC, see Tr. at 8:11-12 (Childress), and rests her personal-jurisdiction arguments on Agentra LLC's vicarious liability for its Co-Defendants' telemarketing calls, see Tr. at 8:15-23 (Childress).[13] Agentra LLC's prohibition on violating federal or state law, see Contract at 2, suggests that Agentra LLC did not convey actual, express authority for the alleged telemarketing activities, and the independent-contractor provision, see Contract at 2, supports Hamilton's position as an independent contractor. The Contract's label "independent contractor," however, does not govern

---

[13]The Tenth Circuit recognizes that a defendant vicariously liable for an agent's action is subject to personal liability in a court based on the agent's actions. See Taylor v. Phelan, 912 F.2d 429, 433-34 (10th Cir. 1990).

the Court's analysis.  See 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1251; Milligan v. Anderson, 522 F.2d at 1207; Chevron Oil Co. v. Sutton, 1973-NMSC-111, ¶ 4, 515 P.2d at 1285. Mohon's allegations about purchasing Agentra LLC's health insurance through the telemarketing call; the text message during the call; Hamilton's apparent access to Agentra LLC's systems, information, and new customer database; Agentra LLC's acceptance of Hamilton as a customer; and the subsequent communications from Agentra LLC suggest that Agentra LLC gave Hamilton implied authority for the telemarketing, that Agentra LLC manifested that Hamilton acted for Agentra LLC, or that Agentra LLC accepted the benefits from Hamilton's sales.  See Complaint ¶¶ 29, 42, 43, at 7, 10-11.  See also Cunningham v. Capital Advance Sols., LLC, No. CV 17-13050 (FLW), 2018 WL 6061405, at *6-7 (D.N.J. Nov. 20, 2018)(Blakey, J.)(concluding that an agency relationship was sufficiently pled where the plaintiff pled the defendant applied for a loan through the telemarketer, thanked him for applying for credit through the telemarketer, and provided a contract for a loan through it); Cunningham v. Rapid Response Monitoring Servs., Inc., 251 F. Supp. 3d 1187, 1198-99 (M.D. Tenn. 2017)(Crenshaw, Jr., J.)(allowing a case to proceed past the motion to dismiss phase on an actual authority theory where the plaintiff did not allege details about the defendant and telemarketers' relationship, but not allowing an apparent authority theory to proceed past the motion to dismiss phase where the defendant did not make any representations manifesting an agency relationship to the plaintiff); Abramson v. Agentra LLC, 2018 WL 6617819, at *3 (concluding that a plaintiff adequately alleged an agency relationship on allegations that Agentra LLC used telemarketing to "promote its products and solicit new clients," advertised for the position of call center representative, and knowingly outsourced the telemarketing role). At this stage, Agentra LLC possesses the better information and the better access to information

on its relationship with Hamilton.  See Response at 8, 12.  See also Charvat v. Allstate Corp., 29 F. Supp. 3d 1147, 1151 (N.D. Ill. 2014)(Bucklo, J.)("[I]t is defendants, not plaintiff, who can reasonably be expected to know these facts, and plaintiff's allegations, taken together, suffice to entitle him to discovery on the issue of vicarious liability.").  The Court agrees with Mohon that discovery is necessary for her to address the Motion, and, accordingly, the Court will grant discovery before deciding the agency-issue intertwined with the personal-jurisdiction issue.

II.   **THE COURT WILL ALSO PERMIT DISCOVERY TO ALLOW MOHON TO RESPOND TO AGENTA'S ARGUMENTS ON THE AGENCY ISSUE FOR THE TCPA, NMUPA, AND TRESPASS-TO-CHATTELS CLAIMS.**

The Court concludes that it will also permit Mohon to seek discovery on the agency issue as it relates to the TCPA-violation, NMUPA-violation, and trespass-to-chattels claims.[14] Preliminarily, the Court concludes that Mohon may pursue NMUPA and trespass-to-chattel claims although she alleges that she received telephone calls to her cellular telephone and does not allege physical interference with her telephone.  The Court will not, at this time, determine whether to dismiss Mohon's TCPA, NMUPA, and trespass-to-chattels claims, because those issues turn on the same vicarious-liability question as the personal-jurisdiction issue on which the Court requires additional information.

A.   **THE NMUPA DOES NOT REQUIRE THAT A PLAINTIFF RECEIVE A CALL TO A LANDLINE TELEPHONE.**

---

[14]Agentra LLC complains that Mohon alleges specifically its liability for only one act.  See Motion ¶ 12, at 3-4.  "The stringent requirement to specifically name which defendant did what to the plaintiff is a standard that tends to apply to complex claims, such as civil rights actions."  Dendy v. Chartrand, No. CIV 18-1118 WPJ, 2019 WL 719762, at *2 (D.N.M. Feb. 20, 2019)(Johnson, J.)(citing Kans. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011).  This case, with its relatively straightforward TCPA-violation, NMUPA-violation, and common law claims is not such a case.  Moreover, as discussed in the Analysis' Section I above, Agentra LLC may be liable, so Mohon can use the term defendants to allege all the Defendants' liability.

Contrary to Agentra LLC's arguments, see Motion ¶ 17, at 5, Mohon can proceed with her claims under the NMUPA. In the Complaint, Mohon alleges that the Defendants violated the NMUPA by calling her and not identifying the call's sponsor within fifteen seconds of her answer. See Complaint ¶ 65, at 13. The Court will allow her to proceed under this theory. The portion of the NMUPA prohibiting such activity contains no reference to a residential subscriber: the NMUPA prohibits "mak[ing] a telephone solicitation for a purchase of goods or services: (1) without disclosing within fifteen seconds of the time the person being called answers the name of the sponsor and the primary purpose of the contact." N.M. Stat. Ann. § 57-12-22(B)(1). Although the NMUPA's definition for "telephone solicitation" contains exceptions that include the phrase "residential subscriber," and the definition for "established business relationship" provides such relationships exist between businesses and "residential subscribers," N.M. Stat. Ann. § 57-12-22(D)(1), (4), the Court does not read those statements as meaning that the NMUPA as a whole applies solely to residential subscribers. Where, as in N.M. Stat. Ann. § 57-12-22(B)(1), the NMUPA does not include the term residential subscriber, the New Mexico Legislature intended the statute to apply to telephones and users other than residential subscribers -- such as, for instance, business subscribers -- and the Court will not read restrictions into the statute that are not in the statute's plain meaning. See Griego v. Oliver, 2014-NMSC-003, ¶ 21, 316 P.3d at 875 ("Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance."). Moreover, the Court concludes in the Relevant Law Regarding the NMUPA section that the Supreme Court of New Mexico would not read "residential subscriber" to limit the NMUPA to landline telephone users. Mohon alleges that she received multiple telephone calls during which the caller did not provide the call's sponsor

within the first fifteen seconds after she answered the call.  See Complaint ¶¶ 20-22 at 5-6; id. ¶ 24, at 6; id. ¶ 31, at 8.  Accordingly, she can proceed under § 57-12-22(B)(1).

In her Response, Mohon also mentions a claim under the NMUPA's provision prohibiting calls to telephone numbers on the National Do Not Call Registry.  See Response at 15.[15]  The Court concludes that Mohon can proceed under this theory as well.  As the Court discusses in the Relevant Law Regarding the NMUPA section, the Court predicts that the Supreme Court of New Mexico would permit a cellular telephone user to bring a claim under § 57-12-22(C)(1).  See N.M. Stat. Ann. § 57-12-22(C)(1).  Mohon alleges that she subscribes her cellular telephone number to the National Do Not Call Registry, see Complaint ¶ 46, at 37, and that she received telephone solicitations, see Complaint ¶¶ 20-22 at 5-6.  Hence, she may proceed under § 57-12-22(C)(1).

**B.     TRESPASS-TO-CHATTELS APPLIES TO THE DEFENDANTS' ALLEGED UNWANTED CALLS TO MOHON'S CELLULAR TELEPHONE.**

For the trespass-to-chattels claim, Mohon has alleged that the Defendants called her cellular telephone repeatedly with unwanted calls.  See, e.g., Complaint ¶ 20, at 5.  The Court predicts, as noted in the New Mexico Law Regarding Trespass to Chattels section, that the Supreme Court of New Mexico would deem these allegations to state a trespass-to-chattels claim. Cf. Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d at 1224-25.  See also Etzel v. Hooters of Am., LLC, 223 F. Supp. 3d at 1314; Mey v. Got Warranty, Inc., 193 F. Supp. 3d at 647; Czech v. Wall St. on Demand, Inc., 674 F. Supp. 2d at 1122.  The Court, accordingly,

---

[15]As described in the Relevant Law Regarding the NMUPA section, this provision prohibits "mak[ing] a telephone solicitation of a residential subscriber whose telephone number has been on the national do-not-call registry, established by the federal trade commission, for at least three months prior to the date the call is made."  N.M. Stat. Ann. § 57-12-22(C)(1).

concludes that, although Agentra LLC did not physically intervene with the cellular telephone, Mohon can bring such a claim as a matter of law under the common-law trespass to chattels. <u>See</u> Motion ¶ 22 at 6.

      **C.    TO THE EXTENT THE MOTION RAISES 12(b)(6) ARGUMENTS, THE COURT WILL CONVERT THE MOTION INTO A MOTION FOR SUMMARY JUDGMENT AND WILL GRANT DISCOVERY TO MOHON TO REPLY TO THE AGENCY ISSUE.**

The Court will convert the Motion into a motion for summary judgment, and will give the parties discovery and Mohon the opportunity to present additional evidence. Agentra LLC's TCPA and NMUPA arguments turn on the Dale Decl. and the Contract, which, according to Agentra LLC, show its and Hamilton's independent-contractor relationship, and which Agentra LLC attaches to the Motion. <u>See</u> Motion ¶ 28, at 8 (citing Dale Decl. ¶ 9-10, at 2; Contract at 2); <u>id.</u> ¶ 32, at 9, 10 (citing Contract at 2); <u>id.</u> ¶ 39, at 11 (citing Dale Decl. ¶¶ 2-3, at 1); <u>id.</u> ¶ 42, at 12 (citing Dale Decl. ¶¶4-8, at 1). "When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" <u>Brokers' Choice of Am., Inc. v. NBC Universal, Inc.</u>, 861 F.3d at 1103 (quoting <u>Alexander v. Oklahoma</u>, 382 F.3d at 1214). <u>See</u> Fed. R. Civ. P. 12 ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). The Dale Decl. and the Contract do not fall into an exception to this rule, as they present information the Complaint does not incorporate, are not central to Mohon's claim, and involvefacts of which the Court cannot take notice. <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. at 322; <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d at 941. The Court, accordingly, must treat the Motion as a motion for summary judgment, and notifies the parties of its intent to make this conversion. <u>See</u>

Price v. Philpot, 420 F.3d 1158, 1167 (10th Cir. 2005)("[W]hen such a conversion occurs, the district court 'must provide the parties with notice so that all factual allegations may be met with countervailing evidence.'" (quoting Burnham v. Humphrey Hospitality Reit Trust, Inc., 403 F.3d 709, 713 (10th Cir. 2005)).

The Court should also, however, give "[a]ll parties . . . a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12. That Agentra LLC placed no outbound calls to Mohon, see Dale Decl. ¶¶ 4-8, at 1, likely forecloses direct liability under the TCPA, the NMUPA, and common-law trespass to chattels. Agentra LLC could face, however, vicarious liability for all three claims, and, as discussed in the Analysis' sub-section I, on jurisdictional discovery, a question exists whether Agentra LLC and Hamilton had a principal-agent relationship. Agentra LLC, more likely than Mohon, possesses information on this relationship, see Charvat v. Allstate Corp., 29 F. Supp. 3d at 1151, and the Court deems discovery necessary for Mohon to provide all evidence related to the issue. Accordingly, the Court will permit discovery on the agency issue underlying the vicarious-liability argument so that Mohon has the opportunity to present additional evidence.

### III. MOHON HAS NOT STATED A COMMON LAW NUISANCE CLAIM, BECAUSE SHE HAS NOT ALLEGED AN INTERFERENCE WITH A REAL PROPERTY INTEREST.

The Court will dismiss Mohon's common-law nuisance claim. Mohon does not state a nuisance claim, because she alleges no intervention with an interest in real property, cf. Jellison v. Gleason, 1967-NMSC-033, ¶ 6, 423 P.2d at 877, Cooper v. Chevron U.S.A., Inc., 2002-NMSC-020, ¶ 33, 49 P.3d at 72; State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque, 1994-NMSC-126, ¶¶ 51-53, 889 P.2d at 198-99, but, rather, uses the word "nuisance" colloquially,

see Complaint ¶ 8, at 4; id. ¶ 51, 53, at 20.  Accordingly, the Court will dismiss the common-law nuisance claim.

## IV.   MOHON HAS STATED A CIVIL CONSPIRACY CLAIM, BECAUSE SHE ALLEGES FACTS ILLUSTRATING A RELATIONSHIP BETWEEN AGENTRA LLC AND HAMILTON SUFFICIENTLY INTERCONNECTED TO MAKE PLAUSIBLE A CIVIL CONSPIRACY.

Contrary to Agentra LLC's arguments, see Motion ¶ 23, at 6, Mohon states a civil-conspiracy claim.  Mohon must allege "'(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts.'"  Seeds v. Lucero, 2005-NMCA-067, ¶ 18, 113 P.3d at 863-64 quoting Silva v. Town of Springer, 1996-NMCA-022, ¶ 25, 912 P.2d at 310).  First, Mohon adequately pleas that a combination exists between Agentra LLC and Hamilton to contact Mohon's cellular telephone with solicitation calls.  See Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 21, 139 P.3d at 207 ("A civil conspiracy requires a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.").  Mohon alleges that Agentra LLC markets through insurance brokers, like Hamilton, who act for it, enter contracts on its behalf, and have access to its exclusive information.  See Complaint ¶¶ 39-40, 42, at 10-11; id. ¶ 45, at 12.  Mohon further alleges that Agentra LLC controlled Hamilton's conduct, see Complaint ¶¶ 39-42, at 10; id. ¶¶ 54-56, at 12, and that, during and after the enrollment process initiated through the solicitation call, she received communications representing the telemarketing occurred on Agentra LLC's behalf, including Agentra LLC's acceptance of her insurance purchase, see Complaint ¶ 29, at 7; id. ¶ 32, at 8; id. ¶ 44, at 10.  To these assertions, Mohon adds that Agentra LLC and Hamilton participated in a "telemarketing conspiracy" and a "massive, nationwide robo-calling conspiracy."

Complaint ¶ 14-15, at 4. Taking the allegations in the light most favorable to Mohon, the factual allegations raise to a plausible level the contention that Agentra LLC and Mohon combined to violate the TCPA, to violate the NMUPA, and to commit a trespass to chattels. See Ashcroft v. Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); Bell Atl. Corp v. Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."); Fritsch v. First Sav. Bank, No. CIV 01-713 LCS/KBM, 2001 WL 37124823, at *5 (D.N.M. Oct. 24, 2001)(Smith, M.J.)("The Tenth Circuit has recognized that even though more than mere conclusory allegations are required to state a valid claim, the nature of conspiracies often makes it impossible to provide details at the pleading stage."). See also Dendy v. Chartrand, 2019 WL 719762, at *5 (concluding that a plaintiff stated a civil conspiracy claim where the plaintiff alleged that one defendant directed the Jane Doe defendants to make telemarketing calls); Cunningham v. Rapid Response Monitoring Servs., Inc., 251 F. Supp. 3d 1187, 1202 (M.D. Tenn. 2017)(Crenshaw, J.)(concluding that a plaintiff stated a claim for civil conspiracy where the plaintiff alleged that the defendant paid a third party to secure it customers and the third party contracted with a telemarketing company to benefit the parties); Consumer Prot. Corp. v. Neo-Tech News, No. CV 08-1983-PHX-JAT, 2009 WL 2132694, at *4 (D. Ariz. July 16, 2009)(Telborg, J.)(recognizing a claim for civil conspiracy where the defendant provided a third party the class members' facsimile transmission numbers and drafted the facsimile transmission, and the third party faxed the class members). Cf. Boyd Estate ex rel. Boyd v. United States, 2015-NMCA-018, ¶ 19, 344 P.3d 1013, 1017-18 (concluding that a plaintiff did not state a claim for

civil conspiracy where the factual allegations supporting the claim were only that the defendant company's attorney contacted the defendant United States' attorney with a proposed legal strategy).

Second, Mohon adequately pleas that a defendant committed several wrongful acts. To plea a TCPA violation, Mohon must allege that (i) a defendant made a telephone call; (ii) to his or her cellphone; (iii) using "any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227. See, e.g., Dendy v. Chartrand, 2019 WL 719762, at *2; Forrest v. Genpact Servs., LLC, 962 F. Supp. 2d at 736; Breslow v. Wells Fargo Bank, N.A., 857 F. Supp. 2d at 1319; Cavero v. Franklin Collection Serv. Inc., 2012 WL 279448, at *2; Hossfeld v. Gov't Emps. Ins., 88 F. Supp. 3d at 509. Mohon states a claim under the TCPA, because she alleges that she received multiple unsolicited telephone calls to her cellular telephone from an artificial or recorded voice. See Complaint ¶¶ 20-22 at 5-6; id. ¶ 24, at 6. To state adequately a violation of the NMUPA's § 57-12-22(B)(1), Mohon must plea that: (i) she received a telephone solicitation for the purchase of goods or services; and (ii) the caller did not disclose the call's sponsor and the contact's primary purpose within fifteen seconds of her answering the call. See N.M. Stat. Ann. § 57-12-22(B)(1). Mohon also states a claim under § 57-12-22(B)(1), because she alleges that she received multiple telephone calls during which the caller did not provide its sponsor within the first fifteen seconds after she answered the call. See Complaint ¶¶ 20-22 at 5-6; id. ¶ 24, at 6; id. ¶ 31, at 8. To plea a § 57-12-22(C)(1) violation, Mohon must allege that: (i) she received a telephone solicitation; and (ii) to a telephone number that has been on the National Do Not Call Registry for at least three months before the call. See N.M. Stat. Ann. § 57-12-22(C)(1). Mohon alleges that she subscribed her cellular telephone number to the National Do Not Call Registry,

see Complaint ¶ 46, at 37, and that she received telephone solicitations, see Complaint ¶¶ 20-22 at 5-6. To allege a trespass-against-chattels claim, Mohon must, as the Court predicts that the Supreme Court of New Mexico will require, allege that she received unsolicited telephone calls to her cellular telephone. As noted above, Mohon alleges that she received several such calls. See Complaint ¶¶ 20-22 at 5-6

Third, Mohon alleges that she suffered harm from the conduct. See Complaint ¶ 53, at 38. According to Mohon, the calls harassed, aggravated, and annoyed her, and invaded her privacy. See Complaint ¶ 53, at 38. Accordingly, Mohon adequately pleas a civil conspiracy claim. Hence, the Court will grant the Motion in part and deny it in part.

**IT IS ORDERED** that: (i) the Defendant Agentra LLC's Motion to Dismiss, filed October 17, 2018 (Doc. 11), is granted in part and denied in part; (ii) Plaintiff Barbara Mohon's request for discovery on the agency issue relevant to the personal jurisdiction issue, the issues regarding violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, and of the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to -26, and the trespass-to-chattels issue is granted; (iii) the nuisance claim in the Complaint for Violations of the Telephone Consumer Protection Act, the Unfair Practices Act and Torts, County of Santa Fe, First Judicial District Court, State of New Mexico (filed in state court August 1, 2018), filed in federal court September 28, 2018 (Doc. 1-1)("Complaint"), is dismissed with prejudice; and (iv) in the Complaint, Mohon states a civil-conspiracy claim.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Sidney Childress
Santa Fe, New Mexico

     *Attorney for the Plaintiff*

Paul S. Grand
Law Offices of Paul S. Grand
Santa Fe, New Mexico

--and--

Michell Lee
William Richmond
Platt Cheema Richmond PLLC
Dallas, Texas

     *Attorneys for Defendant Agentra LLC*